**Opinion issued August 9, 2012**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-10-01085-CR

————————————

**EDWARD GEORGE MCGREGOR, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 434th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 09-DCR-053051**

---

**O P I N I O N**

In this cold-case murder prosecution, a jury convicted appellant, Edward

George McGregor, of capital murder, and, because the State did not seek the death

penalty, the trial court automatically assessed punishment at confinement for life.[1]

In nine issues, appellant contends that (1) and (2) the trial court erroneously admitted evidence of an extraneous murder offense in violation of Texas Rules of Evidence 404(b) and 403; (3) and (4) the trial court erroneously admitted evidence of an extraneous terroristic threat that referenced both the charged offense and the extraneous murder in violation of Rules 404(b) and 403; (5) the trial court erroneously denied his motion to dismiss the indictment for lack of a speedy trial; (6) the trial court erroneously denied his requested jury instruction on third-party culpability; (7) the State failed to present sufficient evidence that he killed the complainant during the course of committing either aggravated sexual assault or burglary; (8) the trial court erroneously admitted physical evidence and DNA test results derived from that evidence because the State failed to establish the chain of custody; and (9) the trial court erroneously denied his motion for mistrial made when a juror indicated during deliberations that she was feeling coerced by the other jurors to change her opinion.

We affirm.

---

[1] *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon 2011).

## Background

### *A.    The Charged Offense*

Former Missouri City Police Department ("MCPD") Officer L. Weathers was dispatched to a house on Whispering Pines in the Hunters Glen subdivision of Missouri City around 11:45 p.m. on April 17, 1990. When Officer Weathers arrived at the house, he noticed that the front door was open, and he saw a white object lying on the walkway to the front door. As he approached the house, he discovered that this object was a blood-stained pillow, and he also saw blood on the walkway and the nearby grass. When he entered the house, he did not see any signs of a struggle in the living room, but he did see blood stains on the front door. Officer Weathers heard a moan, and he discovered the complainant, Kim Wildman, a Caucasian woman in her late thirties, lying on the kitchen floor with the telephone next to her. She was very pale and was moving slightly in pain. Officer Weathers testified that "[t]here was quite a bit of blood in the kitchen," and, because Wildman was not wearing any clothing, he could see numerous stab wounds on her arm, one stab wound near her rib cage, one stab wound near her hip, and deep defensive wounds on her hand.

Wildman was still conscious at the time, and Officer Weathers asked who had attacked her. She stated that "a black man" had attacked her, and she indicated

3

that she did not know her attacker.[2] Officer Weathers tried to obtain a physical description, but Wildman started drifting in and out of consciousness. He testified that she was not in a physical or mental state where she could give him "a lot of information about what happened." Wildman died later that evening.

After backup arrived, Officer Weathers and another officer went upstairs where they discovered a "very brutal scene." Officer Weathers testified that there was blood all over the bed and floor of the bedroom and that the bed had broken at the headboard. He believed that "[t]here had been a heck of a struggle on the bed and in that room." Officer Weathers did not see any weapons in the bedroom, but he testified that there was a chain connected to the headboard of the bed, and this chain had blood on it, as well as a clump of hair consistent with Wildman's. He believed that she had been restrained with the chain at some point.

Officer Weathers further testified that, although he did not see any signs of forced entry by the front door, he saw a dining-room window that had "two holes punched by the lock" and broken glass. He stated that this method of entry is "a fairly common way for burglars to get into houses without shattering the whole window."

---

[2] The trial court admitted the tape of Wildman's 9-1-1 call, during which she stated to the dispatcher that she did not know her attacker. Wildman did not mention a sexual assault during the 9-1-1 call.

On cross-examination, Officer Weathers agreed that Wildman told him that "a black man" attacked her, and she did not further qualify this statement by saying that her attacker was a "young" black man. He did not recall whether he saw any torn clothes in either the bedroom or the kitchen that may "have been ripped off of her as she struggled." He also agreed that the holes in the dining-room window could have been made by the tip of a screwdriver.

Former MCPD Detective R. Echols testified that he arrived at the scene around 12:30 a.m. and that Life-Flight had already taken Wildman to the hospital by this point. He agreed with Officer Weathers that there was a "considerable" amount of blood in Wildman's bedroom, with the majority of the blood located on the mattress and some blood spatters located on the head and footboards of the bed. Because papers were "strewn about" the floor, a table was overturned, and the headboard was broken, Detective Echols believed that a struggle had occurred in the bedroom and that this location was where Wildman was initially attacked. He agreed that making small holes near the locking mechanism of a window was a "fairly common" method of gaining entry into a house. He testified that the dining-room window screen "looked to be intact," but it "was not properly affixed." He stated that there was no indication that theft was the motive for breaking into Wildman's house.

Detective Echols testified that, during the investigation, officers inquired at nightclubs that Wildman was known to frequent, but they did not receive any useful information. He also stated that the officers discovered that Wildman had an interest in topless dancing, but they did not locate any clubs at which she worked as a dancer at the time of her murder.

Detective Echols also testified that, several nights after Wildman's murder, MCPD officers arrested a young man named Corey Henry for attempted burglary in the same neighborhood. Henry was carrying one blade of a pair of scissors and a screwdriver when he was arrested. Detective Echols stated that he later learned that Henry was arrested in Harris County several months after the burglary arrest and charged with aggravated sexual assault. Henry remained the prime suspect in the Wildman murder for several years, but, eventually, he was eliminated as a suspect through DNA testing.

Dr. Aurelio Espinola, who formerly worked as a medical examiner for the Harris County Medical Examiner's office, conducted Wildman's autopsy. Dr. Espinola testified that Wildman had stab wounds on the left side of her chest and her hip, two stab wounds on her left arm, four stab wounds on her back, and defensive wounds on her left hand. Dr. Espinola opined, based on the nature of her injuries, that Wildman resisted her attacker and was moving around while being attacked. He also testified that he believed Wildman's wounds were caused by a

knife that had a blade with two sharp edges as opposed to one sharp edge and one blunt edge. When shown the one-bladed scissor that the MCPD officers recovered from Corey Henry, he testified that it was "very unlikely" that this type of weapon caused Wildman's injuries because part of the scissor was thick and blunt, and, thus, this weapon would have created a stab wound with one sharp edge and one blunt edge.

Dr. Espinola also testified that Wildman had a small laceration on the opening of her vagina. He stated that this was not the type of injury that he would expect to result from sexual intercourse. He further testified that, "in forceful sexual intercourse, there will be abrasion[s] and contusion[s]," and Wildman did not have such injuries. Dr. Espinola also collected oral, vaginal, and rectal swabs during the autopsy. He testified that the vaginal swab revealed spermatozoa with complete heads and tails, which indicated that Wildman had recently had intercourse prior to her death, and the rectal swab revealed spermatozoa with only the heads present.

On cross-examination, Dr. Espinola testified that there was no evidence that Wildman had been strangled by her attacker. He agreed that the vaginal laceration was "pretty small," that he could not tell when that injury occurred, and that he observed no physical trauma indicative of forcible, nonconsensual intercourse close to the time of death. He also agreed that spermatozoa could reside in the

7

vagina for over a day and that he could not say that the sperm he discovered in Wildman's vagina was placed there contemporaneous with her murder.

Houston Police Department ("HPD") Investigator R. Swainson testified that, during the course of investigating a Harris County case in 2005–2006, he met appellant, who voluntarily provided a DNA sample via a buccal swab. Investigator Swainson interviewed appellant at both his apartment and HPD headquarters concerning the Harris County case and released him after the interview. Investigator Swainson testified that at the time he interviewed appellant and obtained appellant's DNA sample he did not know anything about the Wildman murder. Investigator Swainson subsequently learned about the Wildman murder and the fact that appellant's family had lived two doors down from Wildman in 1990 from his partner, Officer J. Binford, and he then shared the results of appellant's buccal swab with the MCPD.

Robin Guidry, a criminal specialist for the HPD Crime Lab, testified that, in 2006, she was an analyst for IdentiGene, a private DNA laboratory that had a contract with HPD to perform DNA testing and analysis services. Guidry stated she developed a DNA profile of appellant from the buccal swab collected by Investigator Swainson.

On cross-examination, Guidry agreed that the presence of DNA in, for example, a murder victim's vagina, by itself, cannot provide information

8

concerning whether the sexual intercourse was consensual or nonconsensual, when the sexual act occurred, or whether the sexual act was connected to the homicide.

Former MCPD Officer A. Wiltse testified that she took over the Wildman investigation in 1996 or 1997, and, a few years after that, she entered the DNA profile recovered from Wildman's autopsy into the CODIS database system with the hope that, at some point, a known DNA sample would match. Several years after this, she had a conversation with HPD Officer Binford concerning appellant.[3] During this conversation, Officer Binford mentioned appellant's parents' address on Whispering Pines. Officer Wiltse then attempted to obtain a comparison of appellant's known DNA profile with the DNA recovered from Wildman's autopsy.

Kristi Wimsatt, a forensic scientist at the Department of Public Safety Crime Lab, testified that her lab received the swabs taken during Wildman's autopsy for testing. Wimsatt stated that she developed a DNA profile during April 2001, when her lab was processing DNA samples from cold cases to upload into a database. Several years later, Wimsatt received appellant's DNA profile that Guidry had completed, and she compared appellant's known DNA profile to the profile that she herself had created from the samples taken during Wildman's autopsy. She

---

[3] Officer Binford testified that he and his partner, Investigator Swainson, interviewed appellant concerning an unrelated offense in February 2006, and he obtained a buccal swab from appellant. After the interview, Officer Binford learned that appellant was planning to move back to Missouri City. He contacted the MCPD and informed Officer Wiltse that appellant planned to move back to his mother's house on Whispering Pines.

concluded that the DNA profile that she obtained from Wildman's vaginal swab was consistent with appellant's DNA profile developed from the buccal swab.

Delores Lee Gable, who has multiple felony convictions and is currently incarcerated at the Hobby Unit in Marlin, Texas,[4] testified that, in April 1990, she and her husband, Brian Gable, who is now deceased, rented a house located close to Wildman's. Gable testified that while she was incarcerated in the Hobby Unit she saw a news report concerning appellant's prosecution and wrote a letter to the Fort Bend County assistant district attorney then assigned to this case telling him that she had relevant information about Wildman's murder.

Gable testified that on April 17, 1990, she and her family returned from dinner around 8:00 p.m. When they arrived, "quite a few" of the neighbors were outside and police officers were at Wildman's house. Gable was taking her children inside the house from the car when she saw appellant, who was seventeen years old at the time of Wildman's murder, speaking with her husband near the end of their driveway. She heard appellant tell her husband that "he had got into it with the lady, and they got into a scuffle, and he didn't mean to, but he had killed her." She stated that appellant pointed toward Wildman's house. Her husband asked

---

[4] Gable testified that she is currently serving a ninety-year sentence for solicitation of capital murder and a seventy-five-year sentence for drug trafficking and has been incarcerated since 1995. She also testified that she first heard from the parole board in January 2010, eight months before the trial in this case. She stated that she has not been promised anything by the State for her testimony in this case and that she is concerned for the safety of herself and her family.

appellant who he was talking about, and appellant responded, "[T]he white lady." Gable also testified that she noticed a "fresh" cut on appellant's face and that she had never seen that cut before. She testified that she would be surprised to learn about a sexual relationship between appellant and Wildman because Wildman "was a sophisticated type of lady" and Gable could not imagine "her with [appellant], being young."

Appellant's younger brother, Tesfa McGregor, testified on appellant's behalf. He stated that his mother and his siblings moved to Whispering Pines in 1989. He testified that he saw Wildman out in her yard on "more than a few occasions," that she was "showy in the kind of clothing that she wore," and that Wildman and appellant exchanged pleasantries when they saw each other. On the day of Wildman's murder, Tesfa and appellant were playing in their backyard until around 6:00 p.m., when their mother called them inside for dinner. After eating, Tesfa went upstairs to his bedroom and stayed up there until around 9:00 p.m. He then went downstairs, saw appellant in his bedroom, and joined him in playing video games. He could not account for appellant's whereabouts in between 6:30 p.m. and 9:00 p.m. Tesfa stayed with appellant for about an hour before going back upstairs. He "dozed off" around 11:00 p.m. and woke up shortly thereafter when he heard "some loud talking" coming from the backyard. He did not hear anyone leave the house from the time he went back upstairs after playing video

11

games with appellant to the time he was awoken by the loud voices, which were police officers in the McGregors' backyard. When Tesfa saw appellant after 11:00 p.m., he was wearing the same clothes that he had been wearing when they had played video games earlier and he did not have any cuts, bruises, or blood on him. He stated that, after the police arrived at Wildman's house, he never saw appellant walk over to another house nearby and talk with the neighbors.

Appellant's mother, Sonia McGregor, also testified on appellant's behalf. She stated that on the night of Wildman's murder, she called her children in for dinner around 6:00 p.m., and she went upstairs while they stayed downstairs to eat. Sonia took a nap until around 9:00 p.m. that evening and then went downstairs to do laundry. She could hear appellant and Tesfa playing video games in appellant's bedroom. Sonia was downstairs for the rest of the evening, and she did not hear or see anyone leave her house. Later, she heard appellant yell that someone was walking in their backyard, and she looked out through the garage and could see flashing lights. The family all ran outside to see what was happening. She testified that, while she was standing outside, appellant did not walk over to any of the other houses on the street. She stated that she had never seen Delores Gable before, and she did not know Gable or her husband.

Appellant testified on his own behalf. One day, appellant was walking back to his house from the store and stopped to talk to Wildman, who was in her front

12

yard.  They "flirted a little bit," and Wildman invited him inside her house where they continued to talk and "kiss a little bit."  Wildman told him that they needed to "think about this" and they needed to be discreet.  Later, "a couple of weeks before" Wildman died, appellant went by her house again and, this time, they had sex.

On the night of Wildman's murder, appellant testified that he played with Tesfa in their backyard until their mother called them inside for dinner around 6:00 p.m.  After Tesfa went upstairs, appellant went over to Wildman's house around 6:30.  Appellant and Wildman then had sex in her bedroom upstairs.  He testified that he did not tie her up with a chain.  He could not say how long he was there, but afterwards, Wildman told him that he needed to go because someone was coming by her house.  When he left, Wildman was still alive and had no injuries.  He did not know what time he arrived back home, but he recalled that it was still daylight when he left Wildman's.

At home, appellant took a shower around 8:30 and then played video games in his bedroom.  All of his family members were upstairs at the time.  At some point in the evening, Tesfa joined him and both of them heard their mother come downstairs and start to do laundry.  After Tesfa went back upstairs, appellant stayed in his bedroom, with the door open, and he did not leave the house until he heard voices in the backyard.  His mother spoke with the police officers, and then

13

the family stood in front of their house and watched the officers and the Life-Flight helicopter. He testified that no one came over to their house and spoke with them, and he did not leave to go to another house. He stated that he had never seen Delores Gable before, and he did not know her husband. Appellant also testified that, several days later, he had a conversation with his friend Jacques Washington, and appellant told him that he had had a "sexual encounter" with Wildman.

## B.    *The Extraneous Offense*

After several pre-trial hearings and hearings outside the presence of the jury, the trial court ultimately ruled that the 1994 murder of Edwina "Nina" Barnum, an African-American woman in her early twenties, in Harris County was admissible as an extraneous offense to prove identity and consent in the Wildman murder. The trial court instructed the jury that testimony concerning the Barnum murder was for "the limited purpose of establishing consent or identity" in the Wildman case and that the jury should only consider the testimony if it believed beyond a reasonable doubt that appellant had committed the extraneous offense mentioned.

HPD Officer H. Ruiz was dispatched to an apartment complex in southeast Houston around sunrise on May 25, 1994. When Officer Ruiz arrived, she saw that the front door to Barnum's apartment had been kicked in. Inside the apartment, she saw a body lying fully-clothed on the floor next to one of the beds in the only bedroom. Officer Ruiz testified that Barnum's hands were bound

14

behind her back with a bootlace, a belt was secured around her neck, and a pillow with a gunshot through it was lying over her head. The bed-sheet was wrapped around one of Barnum's legs "as if she had been pushed off of the bed." Officer Ruiz also observed a bloody knife wrapped in a place mat next to Barnum's body. Officer Ruiz stated that the apartment was "a big mess," with the bedroom being particularly untidy. She observed Crime Scene Unit Officer Cates, who took photographs and processed the scene for evidence, fold up the four corners of the bed-sheet to secure any relevant evidence from the bed. Cates was deceased at the time of appellant's trial.

Former HPD Homicide Division Officer S. Null was assigned to the Barnum murder. When he arrived at the scene after the initial officers responded, the front door to Barnum's apartment was locked, but the center panel of the door had been kicked in. He stated that the apartment "wasn't very well taken care of, kind of messy" and that the contents of Barnum's purse had been dumped onto the kitchen table. Barnum was lying fully-clothed on the bedroom floor and "the sheets to the bed were partially pulled off of the bed onto the floor with [Barnum's] leg." Barnum had a gunshot wound to the back of her head, a stab wound and stun gun wounds on her back, and several shallow cuts on her neck through a belt fastened around her neck. Barnum's arms were bound behind her back. The medical examiner later informed Officer Null that he did not believe that Barnum had been

sexually assaulted because he found no damage or trauma to her vaginal or rectal areas. The medical examiner performed a sexual assault examination and no semen or other bodily fluids were recovered. Officer Null acknowledged, on cross-examination, that he "could find no motive for a sexual assault in this killing." During his investigation at the scene, Officer Null learned that Barnum was a topless dancer at a club called Foxy's Cabaret and that she also worked as a prostitute.

Officer Null, documented the evidence present at the scene while his partner, Sergeant R. Doyle, spoke to potential witnesses. Officer Null testified that he observed Officer Cates gather all of the bedding and put it in a container. Later that day, Officer Cates paged Officer Null and requested that he stop by the crime scene unit office. When Officer Null arrived at the office, Officer Cates had the bed sheets from Barnum's apartment spread out, and Cates showed Null a plastic evidence bag containing a condom, which Cates said he recovered from the sheets.[5] Officer Null identified an HPD evidence bag, which contained a plastic bag with a condom inside, that had the correct case number and offense date pertaining to Barnum's murder and Officer Cates's name and badge number. He

---

[5]     Appellant had previously objected to any testimony concerning the condom on the ground that Officer Cates was deceased, and, therefore, any testimony concerning Cates's statements regarding the condom denied him his right to confrontation. Appellant also objected to admission of the condom and to any discussion of DNA results from the condom on the basis that, because Officer Cates was unavailable, the State did not sufficiently establish the first link in the chain of custody.

16

also testified regarding the procedures used by HPD officers for submitting items of evidence to the property room for storage and lab testing.

Officer Null testified that Monique Johnson, a very good friend of Barnum's, had a physically abusive husband, and Johnson would sometimes stay with Barnum at her apartment. He stated that Johnson's husband, Shun Minor, "would go around and threaten friends and family trying to find out where [Johnson] was." Due to his violent behavior and tendency to threaten those with whom Johnson would seek refuge, Minor became a suspect in Barnum's murder. Minor also owned a .380 caliber handgun, which matched the caliber of the shell casing found at the murder scene.[6] Although Null testified that Minor was his "best suspect," he never arrested Minor because he "didn't have enough [evidence] to arrest him on [Barnum's] murder."

Jennifer Otto, who formerly worked at IdentiGene as a forensic DNA analyst, testified that she performed a DNA analysis on the condom recovered from Barnum's sheets. Otto testified that she compared the DNA profile from the condom to appellant's known DNA profile generated from his buccal swab, and she stated, "[Appellant] cannot be excluded as being a donor to the condom. And the frequency of that DNA profile found on the condom from an unrelated individual at random in the population is less than one in 76 quadrillion people."

---

[6] Ballistics testing later revealed that Minor's handgun was not used in Barnum's murder.

17

Otto also stated that she "[could not] testify" if semen was present on the condom. Otto acknowledged on cross-examination that she could not tell from her analyses the age of the cells present on the condom, and, thus, she could not determine how long the condom had been present in Barnum's sheets.

Adam Osani, who was in custody in the Harris County Jail from September 2007 through February 2008, testified concerning statements appellant made while in jail awaiting trial for the Barnum murder. Osani testified that while they were in custody together, he did not have a friendly relationship with appellant, who was considerably larger and who bullied him. Osani witnessed an incident between appellant and another inmate named Marvin Paxton, who was in the neighboring cell, late one night. According to Osani, appellant had been bullying him, and Paxton told appellant to leave Osani alone. In response, appellant became angry, walked over to the bars in between their cells, reached through the bars towards Paxton, and told him, "Bitch, I'll kill you like I did those other two bitches."

Osani also testified that, later, he and another inmate were discussing how Osani had once visited the Harris County Medical Examiner's office with a friend who worked there. Appellant overheard this conversation and "started being really nice to [Osani]." Appellant asked Osani if he really had a friend who worked in the medical examiner's office, and, when Osani responded that he did, appellant asked, "Let's just say, hypothetically, if somebody needed to collect DNA

evidence, would your friend be able to do that?" Appellant indicated that Osani "would be paid really handsomely," and he mentioned Fort Bend County and asked if Osani's friend had "jurisdiction" to collect DNA evidence from a body.

Marvin Paxton, who had two pending aggravated robbery cases at the time of appellant's trial, testified that he has been in custody in the Harris County Jail since April 2007. He acknowledged that he was subsequently diagnosed with paranoid schizophrenia and bipolar disorder and that he takes medication for both of these disorders. Paxton testified that, in December 2007, appellant, who routinely bullied Osani, again teased Osani, and Paxton intervened on Osani's behalf. According to Paxton, appellant lost his temper, jumped up, grabbed at Paxton through the bars, and told him to "shut [his] f——— mouth before I kill you like I did those two bitches."

At a later date, appellant and Paxton had another conversation and appellant apologized for the earlier incident. During this conversation, Paxton asked appellant if he was "for real" or if he was "just trying to scare" Paxton. Appellant responded, "Oh, yeah, I did it." Paxton testified that appellant said that "he killed those two females, he lost his cool and he killed them. . . . He went to jail, he bonded out, and it was like [a] $250,000 bond." Appellant did not provide any details regarding the victim's names or where the offenses occurred. When asked by the State where appellant had made bond, Paxton testified that he could not

19

remember, but that it was either Fort Bend or Montgomery County. Paxton also testified that when appellant said "and I killed them," he made a strangulation gesture. Appellant did not say that he strangled anyone, but that was how Paxton interpreted the gesture. Regarding the second murder, Paxton testified that appellant said "he lost control again and he did it again." Appellant also indicated that he had had sex with both women, but he did not indicate when sex happened relative to the murders. Paxton believed that appellant was telling the truth about his involvement in those two offenses.

Appellant testified that he first met Barnum at a party around 1990 and that he would flirt with Barnum, although she did not reciprocate his interest. In late February 1994, appellant's girlfriend and Barnum both worked at the same topless club, and, on one occasion, appellant gave Barnum a ride home. Several weeks later, in late March 1994, appellant went to the club to pick up his girlfriend, with whom he had been having relationship troubles, and he again encountered Barnum and gave her a ride home. At Barnum's apartment, the two of them smoked marijuana and ended up having sex. Appellant testified that he used a condom, although he did not remember what happened to it afterwards. He stated that Barnum's apartment was "a mess." On cross-examination, appellant testified that he only had sex with Barnum on this one occasion, two months before Barnum was murdered.

20

After he was arrested for the Wildman murder, appellant told officers that he did not know "Kimberly Wildman," but, at his bond reduction hearing several days later, he admitted that he had had a sexual encounter with Wildman. While out on bond, he was arrested for the Barnum murder on December 1, 2006. In his initial interview, he did not tell the investigating officers that he had known Barnum because "[he] didn't know who Edwina Barnum was."

Appellant testified that while he was in the Harris County Jail, he stayed away from Paxton because he "was sort of crazy." He testified that he never threatened Paxton and he never had a conversation with Paxton about killing two women while out on bond. He further testified that he never had a conversation with Osani concerning removing evidence from the medical examiner's office.

### C.    *Procedural Background*

Appellant was arrested for the Wildman murder on May 2, 2006. Shortly after his arrest, he posted a $250,000 bond. He was not indicted for this offense until October 26, 2009. During the interim time period, appellant was arrested for the Barnum murder on December 1, 2006, and he remained incarcerated in the Harris County Jail for this offense until his trial in this case.

On January 25, 2010, defense counsel moved to dismiss the indictment in the Wildman case due to a denial of appellant's constitutional right to a speedy trial. Over three years and five months elapsed between the date of appellant's

21

arrest and the date of his indictment in the Wildman case, and he contended that he "ha[d] not committed any act or omission contributing to this delay." Defense counsel argued,

> For over 3 years, the State refused to seek indictment and discussed weakness[es] and problems in the death penalty capital case in Harris County [the Barnum case]. Harris County Prosecutors met with Fort Bend County Prosecutors to see [the] possibility of Fort Bend pursuing [the] non-death capital case against Defendant. The State in Harris County also was never ready for trial. Defendant requests that this cause be dismissed. Each time the case has been delayed, it has been delayed through the actions and inactions of the prosecuting attorney and the courts.

He argued that the delay was prejudicial because appellant had suffered "oppressive pre-trial incarceration, as well as much anxiety and concern regarding the outcome to the trial herein." He also argued that he "has suffered in his ability to present his case in that it is difficult to locate witnesses or for witnesses to accurately remember facts."

On March 5, 2010, the trial court held a hearing concerning appellant's speedy trial motion, and both the prosecutor and defense counsel testified at this hearing.[7] Defense counsel testified that he first asserted appellant's right to a speedy trial and moved to dismiss in March 2007, ten months after appellant was

---

[7] At this hearing, the trial court took judicial notice of the file concerning appellant's previous habeas proceeding which related to this charge but had a different cause number. Under that cause number, defense counsel had apparently filed at least two motions to dismiss at a prior time. These motions are not contained in the record in this case.

22

arrested with no indictment pending. The trial court apparently denied this motion, relying on an affidavit from a Fort Bend County assistant district attorney who averred that his office was waiting to indict appellant in the Wildman case until after the Harris County District Attorney's Office determined whether it was going to seek the death penalty in the Barnum case. Defense counsel testified that he filed a second motion to dismiss in October 2008, and, at that time, the same assistant district attorney responded that he was still waiting on the State in the Harris County case. Defense counsel alleged that this response from the assistant district attorney was misleading because a Harris County prosecutor had already informed him that the State was seeking the death penalty in the Barnum case, and that case had an initial trial setting scheduled for September 2008. Counsel testified that, in July 2009, the Harris County District Attorney's Office asked the Fort Bend prosecutors to proceed with the Wildman case first. Appellant was then indicted in October 2009, more than three years after his arrest. Defense counsel testified that appellant has suffered "terrible emotional strain and harm" and that, in addition to the fact that this is a cold case, the pre-indictment delay has caused "three more years of people's memories fading, witnesses, a possibility of finding them growing even more sparse and making [the case] far more difficult to defend."

The prosecutor testified that appellant posted bond in the Wildman case, although he was then incarcerated in Harris County for the Barnum case. He also testified that he was not assigned to the case until August 2009. He acknowledged that the agreement with Harris County to let that case proceed first "would not have prevented [the previous assigned Fort Bend County prosecutor] from getting an indictment" in the Wildman case, but he did not think that appellant's trial would have occurred sooner, because, at the time, the two district attorney's offices had agreed to let Harris County try the Barnum case first.

The trial court ultimately denied appellant's motion to dismiss for lack of a speedy trial.

During the charge conference, defense counsel requested that three instructions concerning third-party culpability be included in the written jury charge. One of these instructions stated:

> You have heard from the evidence that a person other than [the] defendant committed the offense for which the defendant is charged. The defendant is not required to prove the other person's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt; therefore, the defendant is entitled to an acquittal.

> If you have a reasonable doubt as to the defendant's guilt, evidence that another person committed the charged offense may by itself leave you with a reasonable doubt. If after considering all the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty.

The other two requested instructions were substantially similar. The trial court denied all three of these proposed instructions. The charge did, however, include the following limiting instruction concerning the Barnum offense:

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the identity or consent of the defendant [sic], if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

During deliberations, the trial court received a letter from one of the jurors. In this letter, which was also signed by the jury foreperson, the juror requested the substitution of an alternate juror for deliberations. She stated,

> I have listened to all of the testimony and have seen all of the evidence, and my mind, heart, body, and soul ALL agree with the decision I have made. The problem is my decision differs from many of my fellow jurors and I am beginning to feel attacked to change my opinion. I am having headaches, stomach aches, and lack of sleep since this trial has begun. I don't know how this process goes, but I don't think I want to try to be persuaded to change my decision.

In response, defense counsel moved for a mistrial on the basis that the other jurors were "coercing" this juror to change her decision.

The trial court took note of the juror's statement that she did not want to "try to be persuaded to change [her] decision" and stated that "the entirety of jury deliberation is an exchange of opinions and ideas and considerations in an effort to

25

see if [the jury] can achieve a common decision." The court denied the motion for mistrial and sent the following response to the jury: "The law does not allow for jury substitution in such a situation. Please continue your deliberations."

Several hours later, the jury reached a verdict and found appellant guilty of capital murder. Because the State did not seek the death penalty, the trial court automatically assessed punishment at confinement for life.

## Sufficiency of the Evidence

In his seventh issue, appellant contends that the State failed to prove that he caused Wildman's death during the commission of either aggravated sexual assault or burglary of a habitation.

### A. *Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). Our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) ("When

26

conducting a sufficiency review, we consider all the evidence admitted, whether proper or improper.").

The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's determinations of credibility. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton*, 235 S.W.3d at 778 ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

## B.     *Capital Murder*

To establish that appellant committed capital murder in the Wildman case, the State had to prove that appellant intentionally committed the murder in the course of committing or attempting to commit (1) aggravated sexual assault of Wildman or (2) burglary of Wildman's habitation.  *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 2011).  A person commits aggravated sexual assault when the person intentionally or knowingly causes the penetration of the sexual organ of another person by any means, without that person's consent, and causes serious bodily injury.  *Id.* §§ 22.011(a)(1) (Vernon 2011), 22.021(a)(1)(A)(i), 22.021(a)(2)(A)(i) (Vernon Supp. 2011).  Sexual assault is without the consent of the other person if "the actor compels the other person to submit or participate by the use of physical force or violence."  *Id.* § 22.011(b)(1); *see also id.* § 22.021(c) ("An aggravated sexual assault under this section is without the consent of the other person if the aggravated sexual assault occurs under the same circumstances listed in Section 22.011(b).").

A person commits the offense of burglary if, without the effective consent of the owner, he enters a habitation and commits or attempts to commit a felony, theft, or an assault.  *Id.* § 30.02(a)(3) (Vernon 2011).  In a capital murder prosecution, the requirement that the defendant commit a felony is satisfied by the actual murder of the victim.  *Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim.

28

App. 1995). Furthermore, when the indictment lists more than one predicate felony in a capital murder prosecution, the evidence "need only be sufficient to establish one of the underlying felonies in the indictment." *Id.* Thus, if the evidence is sufficient to establish the elements of burglary, we need not determine whether the evidence is also sufficient to establish the elements of aggravated sexual assault. *See id.*; *see also McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997) ("When a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted, the verdict will be upheld.").

Here, Officer Weathers testified that he saw that a dining-room window had two holes punched in the glass near the lock and that there was broken glass on the ground. He opined that this was a common method for burglars to use to enter a house without breaking an entire window. Detective Echols agreed that this was a "fairly common" method of entry, and he further testified that although the dining-room window screen "looked intact," it was not properly affixed.

Upon his arrest for Wildman's murder, appellant initially denied knowing Wildman. He later acknowledged that he was present in Wildman's home on the night of her murder, although he testified that he was present several hours before she died and that they engaged in consensual sex. He denied being present at the time of her murder, and both his mother and his brother testified that they did not

29

hear appellant leave the house that evening. The jury, however, was not required to believe this testimony, and we defer to the jury's credibility determinations. *See Lancon*, 253 S.W.3d at 705.

The State presented evidence that appellant admitted on three different occasions that he killed Wildman. He made his first admission on the night of the murder to Brian and Delores Gable, admitting, while standing in their driveway while police were still at Wildman's house, that he "got into a scuffle," and, although he did not mean to do so, he killed Wildman. According to Delores Gable, at Brian's request for clarification, appellant pointed to Wildman's house and said that he was referring to "the white lady." Appellant's second admission occurred while he was in the Harris County Jail in 2007 awaiting trial on the Barnum murder. Late one evening, after Marvin Paxton told appellant to stop teasing Adam Osani, appellant rushed to the bars in between his cell and Paxton's and told him to "shut [his] f——— mouth before I kill you like I did those two bitches." At a later date, Paxton had a conversation with appellant, and he asked appellant whether his earlier admission was true. Appellant replied in the affirmative and stated that he "lost his cool" and killed two women, indicating that one of the women lived in either Fort Bend or Montgomery County. Appellant told Paxton that he had had sex with both of the victims, although he did not mention when he had sex with the women relative to their deaths.

Osani also testified that appellant overheard a conversation he had with another inmate concerning his visit with a friend who worked at the Harris County Medical Examiner's Office. Appellant, who had previously bullied Osani, started being much more friendly and asked Osani several "hypothetical" questions. He asked, "Let's just say, hypothetically, if somebody needed to collect DNA evidence, would your friend be able to do that?" Appellant asked if Osani's friend had "jurisdiction" in Fort Bend County, and he indicated that if Osani and his friend could help collect DNA evidence from a body, Osani would be paid "really handsomely."

The State therefore presented evidence that appellant entered Wildman's house without her consent, had sex with her, and fatally stabbed her multiple times. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found the essential elements of capital murder—that appellant murdered Wildman in the course of committing burglary—beyond a reasonable doubt.

We overrule appellant's seventh issue.

### Dismissal for Lack of a Speedy Trial

In his fifth issue, appellant contends that the trial court erred in denying his motion to dismiss the indictment for lack of a speedy trial because the State did not

indict him for Wildman's murder until nearly three and a half years after he was arrested.

## A. The Right to a Speedy Trial

The Sixth Amendment to the United States Constitution guarantees an accused the right to a speedy trial. U.S. CONST. amend. VI; *Barker v. Wingo*, 407 U.S. 514, 515, 92 S. Ct. 2182, 2184 (1972); *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). This right attaches once a person becomes an accused; that is, once he is either arrested or charged. *Cantu*, 253 S.W.3d at 280. United States Supreme Court precedent requires us to analyze constitutional speedy-trial claims "on an ad hoc basis" by weighing and balancing the four factors enumerated in *Barker*: (1) the length of the delay; (2) the reason for the delay; (3) the assertion of the right; and (4) the prejudice to the accused. *Barker*, 407 U.S. at 530–33, 92 S. Ct. at 2192–93; *Cantu*, 253 S.W.3d at 280. Although the State bears the burden of justifying the length of delay, the defendant bears the burden of proving that he asserted the right and of showing prejudice. *Cantu*, 253 S.W.3d at 280. The Court of Criminal Appeals has held that the defendant's burden "'varies inversely' with the State's degree of culpability for the delay"; thus, "the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a

32

speedy trial." *Id.* at 280–81 (quoting *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)).

The *Barker* analysis is "triggered" by a delay unreasonable enough to be considered "presumptively prejudicial." *Id.* at 281. There is no set time period that triggers the analysis. *Id.* Once the *Barker* analysis is triggered, we first weigh the strength of each *Barker* factor and then balance the weight of the factors "in light of 'the conduct of both the prosecution and the defendant.'" *Id.* (quoting *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002)). No one factor is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193. Instead, the four factors are related, and we consider them together along with "such other circumstances as may be relevant." *Id.*; *Cantu*, 253 S.W.3d at 281 ("As no factor possesses 'talismanic qualities,' courts must engage 'in a difficult and sensitive balancing process' in each individual case.").

We dismiss the charging instrument with prejudice only upon finding that the defendant's speedy trial right was "actually violated." *Cantu*, 253 S.W.3d at 281. We must "apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Id.*

***B.***     ***Standard of Review***

In reviewing the trial court's ruling on a defendant's speedy trial claim, we apply a bifurcated standard of review. *Id.* at 282; *Zamorano*, 84 S.W.3d at 648. We review the "factual components" for an abuse of discretion and the "legal components" de novo. *Cantu*, 253 S.W.3d at 282; *Zamorano*, 84 S.W.3d at 648. Reviewing the individual *Barker* factors "necessarily involves fact determinations and legal conclusions," but the balancing test "as a whole" is a "purely legal question." *Cantu*, 253 S.W.3d at 282. We defer not only to the trial court's resolution of disputed facts, but also to its right to draw reasonable inferences from those facts. *Id.* (citing *Kelly v. State*, 163 S.W.3d 722, 726–27 (Tex. Crim. App. 2005)). When assessing the evidence presented at a speedy trial hearing, the trial court may completely disregard a witness's testimony based on credibility and demeanor evaluations, even if the testimony is uncontradicted, and it may disbelieve any evidence as long as there is a reasonable and articulable basis for doing so. *Id.* (citing *Kelly*, 163 S.W.3d at 727–28). On appeal, we must view the evidence in the light most favorable to the trial court's ultimate ruling. *Id.* (citing *Zamorano*, 84 S.W.3d at 648).

### C. Analysis

#### 1. Length of the Delay

The length of the delay between the defendant's arrest and his indictment acts as a "triggering mechanism," for until the delay is "presumptively prejudicial," there is no necessity to inquire into the other *Barker* factors. *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192; *Zamorano*, 84 S.W.3d at 648. The length of delay "that will provoke such an inquiry is necessarily dependent on the peculiar circumstances of the case." *Barker*, 407 U.S. at 530–31, 92 S. Ct. at 2192. If the accused demonstrates that the delay qualifies as "presumptively prejudicial," we must then consider "the extent to which that delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Zamorano*, 84 S.W.3d at 649. The presumption that pretrial delay has prejudiced the accused "intensifies over time." *Id.* Thus, "any speedy trial analysis depends first upon whether the delay is more than 'ordinary'; if so, the longer the delay beyond that which is ordinary, the more prejudicial that delay is to the defendant." *Id.*

In this case, appellant was arrested for the Wildman murder on May 2, 2006, and he was not indicted until October 26, 2009, a delay of three years and five months. Appellant was released on bond in the Wildman case shortly after he was arrested, and he remained at liberty until he was arrested on December 2, 2006, for the Barnum murder. Appellant remained incarcerated for the Barnum murder until

the time of his trial in the Wildman case. Appellant moved to dismiss the indictment in the Wildman case on January 25, 2010, and the trial court heard the motion on March 5, 2010.

The State concedes that the three-year-and-ten month delay between appellant's arrest and the date the trial court heard his motion to dismiss is sufficiently lengthy to trigger our analysis of the other *Barker* factors. We agree. Because the length of the delay "stretched well beyond the bare minimum needed to trigger judicial examination of the claim, this factor . . . weighs heavily against the State." *See id.* (holding two-year-ten-month delay between arrest and hearing on speedy trial motion sufficiently lengthy to trigger *Barker* analysis).

### 2.    *Reasons for the Delay*

Related to the length of the delay is the reason that the government assigns to justify the delay. *Id.* (quoting *Barker*, 407 U.S. at 531, 92 S. Ct. at 2182). The State bears the burden of justifying the length of the delay. *Cantu*, 253 S.W.3d at 280. A "deliberate attempt" on the part of the State to delay the trial to hamper the defense weighs heavily against the government, "while a more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Zamorano*, 84 S.W.3d at 649 (quoting *Barker*, 407 U.S. at 531, 92 S. Ct. at 2182).

36

The fact that the defendant is being prosecuted on other charges constitutes a valid reason for a delay in bringing him to trial on the charged offense at issue. *Easley v. State*, 564 S.W.2d 742, 745 (Tex. Crim. App. 1978); *McIntosh v. State*, 307 S.W.3d 360, 367 (Tex. App.—San Antonio 2009, pet. ref'd) ("The prosecution of the defendant on other charges may be a valid reason for a delay in bringing him to trial."); *Thompson v. State*, 983 S.W.2d 780, 783 (Tex. App.—El Paso 1998, pet. ref'd) ("Prosecution of the defendant on other charges is a valid reason for delay and does not weigh against the State so long as the amount of delay is appropriate."). To sustain its burden on this factor, however, the State must offer argument and proof that the defendant was being prosecuted on other charges. *McIntosh*, 307 S.W.3d at 367; *see also Cerf v. State*, No. 07-10-00451-CR, 2012 WL 1252963, at *7 (Tex. App.—Amarillo Apr. 12, 2012, no pet. h.) ("[D]uring some of the delay at issue here, appellant was preparing for earlier filed charges in Dawson County. So, although the State's argument and proof on that issue is not overwhelming, some of the delay could be attributable to that unrelated proceeding.").

At the hearing on appellant's motion to dismiss, the State asserted that the pre-indictment delay was due to an agreement with Harris County, whereby the respective district attorneys' offices agreed that Harris County would proceed first on the Barnum case, in which it was potentially seeking the death penalty, and Fort

Bend County would wait to prosecute the Wildman case, which was not a death penalty case. According to the State, on July 23, 2009, Harris County ultimately requested, due to problems with its case, that Fort Bend County prosecute the Wildman case first. Fort Bend County then assigned a new prosecutor to the Wildman case, and, after he familiarized himself with the case, he obtained an indictment in October 2009. The State conceded that its agreement with Harris County did not affect its ability to obtain a formal indictment against appellant.

The State thus asserted a valid reason for its delay in bringing appellant to trial on the Wildman case: due to the pending charges in two different jurisdictions, the Fort Bend County District Attorney's Office and the Harris County District Attorney's Office had an agreement that Harris County would prosecute the Barnum murder first. It was only after Harris County re-evaluated the Barnum case and determined that it had problems with the case that the respective district attorneys' offices agreed that Fort Bend County would prosecute the Wildman case. The State obtained an indictment in the Wildman case within three months of this decision. Prosecution of the defendant for unrelated charges in a different jurisdiction constitutes a valid reason for delay. *See Easley*, 564 S.W.2d at 745; *McIntosh*, 307 S.W.3d at 367; *Thompson*, 983 S.W.2d at 783. This factor, therefore, is neutral in the balancing analysis.

### 3.    *Assertion of the Right*

Although it is the State's duty to bring the defendant to trial, the defendant does have the responsibility to assert his right to a speedy trial.  *Cantu*, 253 S.W.3d at 282; *Zamorano*, 84 S.W.3d at 651.  "Whether and how a defendant asserts this right is closely related to the other three factors because the strength of his efforts will be shaped by them."  *Cantu*, 253 S.W.3d at 282–83; *Zamorano*, 84 S.W.3d at 651.  Therefore, the defendant's assertion of his speedy-trial right, or his failure to assert it, "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right."  *Cantu*, 253 S.W.3d at 283; *Zamorano*, 84 S.W.3d at 651 ("Conversely, a failure to assert the right makes it difficult for a defendant to prove that he was denied a speedy trial.").  Filing for dismissal of the indictment instead of moving for a speedy trial generally weakens the defendant's claim "because it shows a desire to have no trial instead of a speedy one."  *Cantu*, 253 S.W.3d at 283.  If the defendant

> fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure.  Repeated requests for a speedy trial weigh heavily in favor of the defendant, while the failure to make such requests supports an inference that the defendant does not really want a trial, he wants only a dismissal.

*Id.*

"Although one cannot file a motion for a speedy trial until formal charges are made, the right to one can be asserted in other ways."  *Id.*  Invocation of the

39

speedy-trial right "need not await indictment, information, or other formal charge." *Dillingham v. United States*, 423 U.S. 64, 65, 96 S. Ct. 303, 304 (1975); *Cantu*, 253 S.W.3d at 284 ("Because appellant never asked for a speedy trial—he asked only for a dismissal—it was incumbent upon him to show that he had tried to get the case into court so that he could go to trial in a timely manner."). An accused who has been arrested but not charged has two choices: (1) wait until he is charged, file a motion requesting a speedy trial, and, if the trial court does not grant this motion, then file a motion to dismiss "because he has diligently sought what he is entitled to—a speedy trial," or (2) wait until he is charged and file a motion to dismiss "if he can show that he diligently tried to move the case into court before formal charges were filed." *Cantu*, 253 S.W.3d at 284.

Defense counsel first moved to dismiss in March 2007, and he then filed an amended motion to dismiss in October 2008.[8] At the time of these first two motions, no indictment had been returned in the Wildman case. Defense counsel filed the third motion to dismiss, the subject of the speedy-trial hearing, in January 2010, three months after the State indicted appellant. All three of these motions sought dismissal of the charges against him; appellant never demanded a speedy trial. Aside from the first two motions to dismiss, defense counsel did not testify

---

[8] Neither of these motions are included in the record. Thus, the only evidence that defense counsel filed these two motions is counsel's testimony to this effect at the speedy-trial hearing.

that he took any other actions to try "to move the case into court before formal charges were filed." *Id.*

Appellant only sought dismissal of the charges against him, instead of demanding a speedy trial, and he presented no evidence that he or his counsel made any attempts to "diligently [try] to move the case into court before formal charges were filed." *Id.* These facts suggest that appellant "[did] not really want a trial, he [wanted] only a dismissal." *Id.* at 283. We conclude that this factor weighs against appellant.

### 4. *Prejudice Caused by the Delay*

When we analyze the fourth factor—the extent to which the delay has prejudiced the defendant—we do so in light of the defendant's interests that the speedy-trial right was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize the accused's anxiety and concern; and (3) to limit the possibility that the accused's defense will be impaired. *Id.* at 285; *Zamorano*, 84 S.W.3d at 652. The last type of prejudice is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Cantu*, 253 S.W.3d at 285 (quoting *Dragoo v. State*, 96 S.W.3d 308, 316 (Tex. Crim. App. 2003)); *Zamorano*, 84 S.W.3d at 652 ("[A] defendant's claim of a speedy trial violation need not necessarily demonstrate prejudice to his ability to present defensive matters."). Evidence of the defendant's generalized

anxiety, although relevant, "is not sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation." *Cantu*, 253 S.W.3d at 286.

Appellant argues that "at least one key witness," Officer Cates, died prior to trial and thus his testimony, needed to establish the chain of custody of the condom found at the Barnum murder scene, was unavailable. Appellant provided no evidence of when Officer Cates died, and the record does not reflect whether Cates died during the time period between appellant's arrest and indictment. He does not explain how the death of Officer Cates prejudiced him in any way, rather than benefitting him.

Although appellant argues that he "has worry [sic] over lapsed memories of witnesses," this prosecution was of a cold-case murder that occurred sixteen years before appellant's arrest. Memory loss was therefore a potential problem regardless of how quickly the State indicted and brought appellant to trial after his arrest. At the hearing on the motion to dismiss, defense counsel testified that the post-arrest delay has caused "three more years of people's memories fading, witnesses, a possibility of finding them growing even more sparse and making it far more difficult to defend." Defense counsel did not, however, identify specific problems due to faded memories or specific witnesses, other than Officer Cates,

42

who were unavailable due to the delay. Nor does he indicate how he was prejudiced by the faded memories of any witness. *See id.* at 285.

Regarding appellant's anxiety and concern during the pre-indictment delay, appellant himself did not testify during the hearing. Instead, defense counsel testified:

> I've dealt with him and met with him, talked with him many times. The emotional strain of being under charges in a county and you can't even get an indictment and get into a courtroom to proceed for your innocence, is a terrible emotional strain and harm to this defendant.

Defense counsel presented no further testimony regarding appellant's anxiety— such as anxiety-induced illnesses or other physical manifestations—or other hardships caused by the delay. Appellant thus presented no evidence that he suffered from any anxiety greater than that normally experienced by defendants facing criminal prosecution. This factor, therefore, weighs against dismissal of the indictment.

### 5. *Balancing of Barker Factors*

The delay in this case between appellant's arrest and his indictment—three years and five months—was presumptively prejudicial and weighs in favor of dismissal on speedy-trial grounds. The State's reason for the delay—the agreement between the Fort Bend and Harris County District Attorneys' Offices— is neutral in the analysis, but the remaining two factors weigh against dismissal.

43

The State asserted a valid reason for the delay in bringing appellant to trial on the Wildman case: the Fort Bend County District Attorney's Office had an agreement to let the Harris County District Attorney's Office prosecute appellant on the Barnum murder first. Once Harris County determined that it had problems with the Barnum case, it agreed to let Fort Bend County's prosecution of the Wildman case proceed, and the State obtained an indictment on the Wildman case within three months.

Appellant moved on three occasions for dismissal of the indictment, but he never asserted his right to a speedy trial by actually requesting or demanding a trial. This conduct indicates that what appellant truly sought was dismissal of the charges and not a trial. *See id.* at 283 ("[T]he failure to make such requests [for a speedy trial] supports an inference that the defendant does not really want a trial, he wants only a dismissal."). Moreover, appellant presented no evidence concerning the efforts his counsel took to "move the case into court before formal charges were filed." *See id.* at 284.

Appellant was not incarcerated for the Wildman case during the time period in between his initial arrest and the return of the indictment, and he presented no evidence that he suffered from anxiety above and "beyond the level normally associated with a criminal charge or investigation." *See id.* at 286. Although Officer Cates died during the interim time period between the Barnum murder in

44

1994 and the prosecution of the Wildman case in 2010, there is no evidence that he died during the time period after appellant was arrested for the Wildman murder but before he was indicted, nor is there any evidence that Officer Cates's death hindered appellant's defense. Appellant also presented no evidence concerning specific memory problems relating to specific witnesses, nor did he address how any memory problems that did exist were the result of the pre-indictment delay instead of the fact that this was a cold-case prosecution of a nearly twenty-year-old crime. Finally, appellant makes no showing that he was prejudiced by the fading memories of any witness.

We therefore conclude that, when balancing the four *Barker* factors, appellant has not demonstrated that the trial court erred when it denied his motion to dismiss the indictment on speedy trial grounds.

We overrule appellant's fifth issue.

**Admission of Extraneous Offense**

In his first and second issues, appellant contends that the trial court erroneously admitted evidence of the extraneous Barnum murder in violation of Texas Rules of Evidence 404(b) and 403. In his third and fourth issues, appellant contends that the trial court erroneously admitted evidence of the terroristic threat made to Paxton, which referenced the Barnum murder, in violation of Rules 404(b) and 403.

### A. *Standard of Review*

We review a trial court's decision to admit evidence concerning an extraneous offense for an abuse of discretion. *See Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004) ("A trial court's Rule 404(b) ruling is reviewed under an abuse of discretion standard."); *Jabari v. State*, 273 S.W.3d 745, 751 (Tex. App.—Houston [1st Dist.] 2008, no pet.). As long as the trial court's ruling is within the "zone of reasonable disagreement," the court does not abuse its discretion, and we will uphold the ruling. *Jabari*, 273 S.W.3d at 751; *Thomas v. State*, 126 S.W.3d 138, 143 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

### B. *Admissibility under Rule 404(b)*

The general rule is that a defendant may not be tried for a collateral crime or for being a criminal generally, which is why Rule 404(b) prohibits the admission of an extraneous offense at trial to prove a defendant's character or to show that the defendant acted in conformity with that character. TEX. R. EVID. 404(b); *Jabari*, 273 S.W.3d at 751; *Curtis v. State*, 89 S.W.3d 163, 170 (Tex. App.—Fort Worth 2002, pet. ref'd). Extraneous offenses may, however, be admissible for other purposes, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b); *Jabari*, 273 S.W.3d at 751.

### 1.    *Identity*

An extraneous offense may be admissible to prove identity only if the identity of the perpetrator is at issue in the case. *Page*, 137 S.W.3d at 78 ("For proof of identity to be a valid purpose, it must be an issue in the case."); *see also Jabari*, 273 S.W.3d at 751. Identity can be raised by cross-examination, such as the impeachment of the identifying witness on a material detail of identification, or by presenting an alibi defense. *Page*, 137 S.W.3d at 78; *Jabari*, 273 S.W.3d at 751; *see also Hudson v. State*, 112 S.W.3d 794, 801 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) ("In raising a defensive theory, a defendant opens the door for the State to offer rebuttal testimony concerning an extraneous offense if the extraneous offense has characteristics common with the offense for which the defendant is being tried.").

Raising the issue of identity "does not automatically render evidence of an extraneous offense admissible." *Jabari*, 273 S.W.3d at 751 (citing *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006)). "When the extraneous offense is introduced to prove identity by comparing common characteristics, it must be so similar to the charged offense that the offenses illustrate the defendant's 'distinctive and idiosyncratic manner of committing criminal acts.'" *Page*, 213 S.W.3d at 336 (quoting *Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005)); *see also Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008)

47

("Usually, it is the accretion of small, sometimes individually insignificant details that marks each crime as the handiwork or *modus operandi* of a single individual."). Extraneous offense evidence is admissible to prove identity "when the common characteristics of each offense are so unusual as to act as the defendant's 'signature.'" *Page*, 213 S.W.3d at 336 (quoting *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996)); *see also Russell v. State*, 113 S.W.3d 530, 541 (Tex. App.—Fort Worth 2003, pet. ref'd) ("[T]o be admissible to show identity, an extraneous offense must be so similar to the charged offense as to *mark* the offenses as the defendant's handiwork.") (emphasis in original). The "signature" must be apparent from a comparison of the circumstances in both cases. *Page*, 213 S.W.3d at 336 (citing *Bishop v. State*, 869 S.W.2d 342, 346 (Tex. Crim. App. 1993)). "Without a high degree of similarity, the probative value of the extraneous offense evidence is outweighed by its prejudicial effect." *Jabari*, 273 S.W.3d at 752 (citing *Bishop*, 869 S.W.2d at 346). In reviewing the trial court's determination, we consider the specific characteristics of the offenses and the time interval between them. *Id.* (citing *Thomas*, 126 S.W.3d at 144). "Sufficient similarity may be shown by proximity in time and place *or* by a common mode of committing the offenses." *Id.* (citing *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996)) (emphasis in original).

48

Here, the State presented evidence that appellant knew both Wildman and Barnum and that he had a friendly, or even flirtatious, relationship with both women. Appellant acknowledged that he had sex with both women, and DNA evidence revealed the presence of appellant's DNA in Wildman's vagina at the time of her murder and in a condom located on Barnum's bed on the night of her murder. *See Segundo*, 270 S.W.3d at 89 ("DNA found in both murder victims matched appellant's DNA profile—it is as if appellant left his calling card in both Vanessa and Maria or carved a 'Z' upon their foreheads as his unique signature."). Both Wildman and Barnum were single women who lived alone, and both women were, or had an interest in being, topless dancers. In both instances, there was no physical evidence of forcible, nonconsensual sex, but there was evidence of forced entry into the victims' homes. Both women were violently attacked at night, in their bedrooms, possibly while on their beds, and there was evidence that both women were restrained in some manner during the attack—officers discovered blood and hair consistent with Wildman's on a chain on her bed, and Barnum's hands were tied behind her back and she had a belt wrapped around her neck. Both women suffered multiple fatal stab wounds.

Appellant attempts to distinguish *Segundo* by pointing out that, in ruling that the extraneous offense was admissible to prove identity, the Court of Criminal Appeals found several similarities in the circumstances and manner of the victims'

49

death in addition to the presence of the defendant's DNA. *See id.* ("Second, the similarities between the two offenses marked them as products of appellant's *modus operandi*: both victims were manually strangled; both had been raped immediately before their deaths; their bodies were nude from the waist down; appellant's DNA was found in the vaginas of both victims. The similarities of these details are sufficient to mark the two rape-murders as the handiwork of a single person, appellant."). Appellant identified several dissimilarities between Wildman's and Barnum's murders that, he contends, renders the extraneous Barnum murder inadmissible to show identity. Specifically, he points out that Barnum's murder occurred four years after Wildman's; that Wildman was Caucasian and Barnum was African-American; that Wildman was thirty-eight and Barnum was twenty-three; that the women had different body sizes; that the murders occurred in different parts of the greater-Houston area; that Barnum suffered several different types of injuries in addition to being stabbed, while Wildman was merely stabbed; that Wildman was found unclothed while Barnum was fully dressed; and that appellant's DNA was found in Wildman's vagina but was found in a condom located on Barnum's bed.

In *Segundo*, however, the Court of Criminal Appeals noted that dissimilarities existed between the charged crime and the extraneous offense, but it concluded that "[a]ll other dissimilarities between the offenses—years between the

50

crimes, age of the victims, location, and so forth—are immaterial to the singular relevant fact: appellant's semen was deposited in [the victims'] vaginas at or near the time of their strangulation deaths." *Id.* at 89–90. Here, although there are some differences in the surrounding circumstances and the ways in which Wildman and Barnum were murdered, there are also enough similarities such that the presence of appellant's DNA at the murder scene, either in or close to the victims' bodies, is not the only "significant similarit[y]" that the two offenses have in common.

We hold that the trial court reasonably could have concluded that the Barnum murder was sufficiently similar to the Wildman murder such that evidence of the Barnum murder was admissible to prove identity in the Wildman case. We therefore hold that the trial court did not abuse its discretion in admitting evidence of the Barnum murder pursuant to Rule 404(b).

We overrule appellant's first issue.[9]

## C.  *Admissibility under Rule 403*

In his second issue, appellant contends that, even if evidence of the Barnum murder is admissible under Rule 404(b), the trial court abused its discretion in

---

[9]  Because we conclude that the Barnum murder was sufficiently similar to the Wildman murder such that evidence of the Barnum murder was admissible to prove identity, we need not consider whether evidence of the Barnum murder was admissible to prove consent, which was raised by appellant in a sub-issue to his first issue.

51

admitting the evidence because the probative value of the Barnum murder is substantially outweighed by its prejudicial effect, and, therefore, the trial court should have excluded the evidence pursuant to Rule 403.

Even when the admission of extraneous offense evidence is permissible under Rule 404(b), we must still determine whether the probative value of the offense is substantially outweighed by the danger of unfair prejudice under Rule 403. TEX. R. EVID. 403; *Jabari*, 273 S.W.3d at 752; *Blackwell v. State*, 193 S.W.3d 1, 9 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). We consider the following factors when conducting a Rule 403 analysis: (1) the strength of the extraneous offense evidence to make a fact of consequence more or less probable; (2) the potential of the extraneous offense to impress the jury in some irrational but indelible way; (3) the time during trial that the State requires to develop evidence of the extraneous misconduct; and (4) the need by the State for the extraneous evidence. *Blackwell*, 193 S.W.3d at 9 (citing *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002)). We uphold the trial court's ruling on a Rule 403 balancing test, whether explicit or implied, if it is within the zone of reasonable disagreement. *Jabari*, 273 S.W.3d at 753.

The first factor in the Rule 403 balancing analysis is the strength of the extraneous offense evidence to make a fact of consequence more or less probable. *Blackwell*, 193 S.W.3d at 15. At trial, appellant disputed his identity as the

murderer and raised an alibi defense, contending that, although he had consensual sex with Wildman on the night of her murder, he was at his own house at the time she was killed. The Barnum murder, which shares several characteristics with the Wildman murder, most notably the presence of appellant's DNA at the scene, "is compelling as to the issue of identity" and is probative of appellant's identity as the perpetrator of Wildman's murder. *Jabari*, 273 S.W.3d at 753; *Blackwell*, 193 S.W.3d at 15 ("The extraneous offense evidence was probative of appellant's intent to commit the sexual offense against J.H. by showing that appellant had a similar sexual intent with K.S. and C.R. . . ."). Because this extraneous offense evidence makes appellant's identity as Wildman's murderer more probable, this factor "weighs strongly in favor of admissibility." *Blackwell*, 193 S.W.3d at 15.

The second factor requires that we examine the extraneous offense evidence "for its potential to impress the jury in some irrational but indelible way," such as character conformity. *Id.* An impermissible inference of character conformity, however, can be minimized by the use of a limiting instruction. *Jabari*, 273 S.W.3d at 753; *Blackwell*, 193 S.W.3d at 15 ("The trial court's instructions to the jury are a factor to consider in determining whether the jury considered the extraneous-offense evidence improperly, i.e., as character conformity evidence, or properly, as evidence to rebut a defensive theory or some other permissible reason under rule 404(b)."). We must further consider the "emotional weight" of the

extraneous offense evidence and whether that evidence was "graphic." *Blackwell*, 193 S.W.3d at 17.

Here, two officers described Barnum's injuries, which were numerous and severe, although they did not spend a large amount of their testimony dwelling on the nature of Barnum's injuries. The trial court admitted twenty-two pictures relating to the Barnum murder, eleven of which showed Barnum's body either at the murder scene or at the medical examiner's office. Although these pictures depicted Barnum's injuries, they were not "overly graphic," and they contained significantly less blood and gore than the pictures of the Wildman scene. *See id.* In addition, these pictures were some evidence of the similarity in the *modus operandi* of the attacks, which is highly probative. *See Segundo*, 270 S.W.3d at 89; *see also* TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . .").

Moreover, before the trial court allowed the State to present evidence of the Barnum murder, the court gave the following limiting instruction to the jury:

> [W]e have another witness who also could give some testimony related to an extraneous offense. So, again, I want to advise you that this testimony is given for the limited purpose of establishing consent or identity, and you are not to consider it unless you believe beyond a reasonable doubt [that] the defendant was guilty of the offense mentioned.

54

The trial court included a substantially similar instruction in the written charge. These instructions thus informed the jury that it could consider the Barnum evidence only for the purposes of establishing consent or identity, and not for character-conformity purposes. *See Blackwell*, 193 S.W.3d at 17 ("The jury here was therefore adequately apprised that it could rely on the extraneous offense evidence solely for other purposes than character-conformity evidence."); *see also Jabari*, 273 S.W.3d at 753 ("Here, the trial court instructed the jurors to limit their consideration of the extraneous offense evidence."). This factor, therefore, weighs in favor of admissibility.

"The third factor evaluates the time during trial that the State required to develop evidence of the extraneous misconduct." *Blackwell*, 193 S.W.3d at 18. Here, appellant's trial lasted fourteen days. The jury heard seven days of evidence pertaining solely to the Wildman murder. The State spent at least three full days solely presenting evidence relating to the Barnum murder. At least four witnesses—appellant, Investigator Swainson, Osani, and Paxton—presented testimony relevant to both the Wildman and the Barnum murders. Approximately one-third of the trial, therefore, was spent developing testimony relevant to the Barnum murder. We conclude that this factor weighs against admissibility of the Barnum offense. *See Newton v. State*, 301 S.W.3d 315, 321 (Tex. App.—Waco 2009, pet. ref'd) (holding factor weighed in favor of exclusion of extraneous

offense when evidence of extraneous offense amounted to approximately twenty-seven percent of testimony at trial); *Russell v. State*, 113 S.W.3d 530, 546 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding same when evidence of extraneous offense amounted to thirty percent of trial).

The fourth factor examines the State's need for the evidence. This factor favors admissibility of the extraneous Barnum murder. There were no eyewitnesses to the Wildman murder, and, although appellant admitted that he was present in Wildman's home and had sex with her on the night of her murder, he disputed the State's theories that he sexually assaulted Wildman and that he was present at the time of her murder. Appellant vigorously attacked the credibility of Gable, Osani, and Paxton, all of whom claimed that appellant admitted his involvement in the Wildman murder to them, and he presented alibi testimony from his mother and younger brother. Appellant's DNA at the Wildman scene establishes that he was present in her house and that, at some point, he had sex with Wildman, but it "does not directly identify him as [Wildman's] attacker." *Jabari*, 273 S.W.3d at 753.

When we consider all four factors together, only the third factor, the time spent developing the evidence concerning the extraneous offense, weighs against admissibility. We therefore conclude that the trial court was within the zone of reasonable disagreement when it implicitly ruled that the probative value of the

extraneous Barnum murder was not substantially outweighed by its prejudicial effect. *See Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) ("[Rule 403] envisions exclusion of evidence only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'") (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)). We hold that the trial court did not abuse its discretion when it did not exclude evidence of the Barnum murder pursuant to Rule 403.

We overrule appellant's second issue.

### D.     Admissibility of Terroristic Threat to Paxton

In his third and fourth issues, appellant contends that "[t]he trial court erred in allowing evidence of extraneous offenses of murder and terroristic threat told by Adam Osani and Marvin Paxton in violation of" Rules 404(b) and 403. Appellant argues that there is no way to determine to whom appellant was referring in his terroristic threat—"Bitch, I'll kill you like I did those other two bitches"—and there is no way for the State to prove appellant's guilt beyond a reasonable doubt. He notes that Osani's and Paxton's testimony was contradictory and "contrary to the counties and time involved in [the] Wildman and Barnum cases."

The State did not offer Osani's and Paxton's testimony as evidence of an extraneous offense separate and apart from the Barnum offense; instead, the State offered this evidence as proof that appellant committed both the Wildman murder

and the extraneous Barnum murder. This statement is an admission by a party-opponent, supporting the allegation that appellant killed Wildman and Barnum. *See* TEX. R. EVID. 801(e)(2); *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999) ("Rule 801(e)(2)(A) plainly and unequivocally states that a criminal defendant's own statements, when being offered against him, are not hearsay."); *see also Drone v. State*, 906 S.W.2d 608, 611 (Tex. App.—Austin 1995, pet. ref'd) ("[A]n inmate in the Milam County jail[] testified that he heard an argument between appellant and another inmate during which appellant said, 'I will kill you, too.' . . . [T]his was an admission by [a] party-opponent . . . ."). This is evidence that the jury could consider when determining whether the State proved, beyond a reasonable doubt, that appellant killed Wildman and committed the extraneous Barnum murder. It was within the province of the jury to determine Osani's and Paxton's credibility and to determine whether, assuming appellant made the threat, he was referring to Wildman and Barnum.

The State was not required to prove, beyond a reasonable doubt, that appellant actually made this threat to Paxton. Regardless, as the State notes, a person commits the offense of terroristic threat if he "threatens to commit any offense involving violence to any person . . . within intent to . . . place any person in fear of imminent serious bodily injury." TEX. PENAL CODE ANN. § 22.07(a)(2) (Vernon 2011). Osani's and Paxton's testimony is some evidence that appellant

58

threatened to kill Paxton, which constitutes a threat to commit an offense involving violence, and that appellant made the threat in order to make both men afraid of him and his ability and willingness to use violence.

We overrule appellant's third and fourth issues.[10]

## Denial of Requested Third-Party Culpability Instruction

In his sixth issue, appellant contends that the trial court erred in denying his requested jury instructions on the defense of third-party culpability.

The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case [and] not expressing any opinion as to the weight of the evidence . . . ."  TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007).  The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications when they are raised by the evidence. *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007).  The defendant is entitled to an instruction on every defensive issue raised by the evidence, "regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony is not worthy of belief."  *Id.* at 209.  The Court of Criminal Appeals has held, however, "that if the defensive theory is not explicitly listed in the penal code—if it merely negates

---

[10]     To the extent appellant contends that the admission of this threat was erroneous due to the reference to *two* murders, we note that we have already held that the trial court properly admitted extraneous offense evidence concerning the Barnum murder.

an element of the State's case, rather than independently justifying or excusing the conduct—the trial judge should not instruct the jury on it." *Id.*; *see also Giesberg v. State*, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) ("[B]ecause the authority to establish what constitutes a defense rests solely with the Legislature, this Court concludes [that] a defense which is not recognized by the Legislature as either a defense or as an affirmative defense does not warrant a separate instruction.").

In *Giesberg*, the Court of Criminal Appeals addressed whether the trial court properly denied the defendant's requested jury instruction concerning the defense of alibi. In holding that the trial court correctly denied the instruction, the Court of Criminal Appeals noted that alibi "was excluded from the Revised Penal Code's list of defenses and affirmative defenses because it only serves to negate a necessary element of proof in the State's case—the defendant's presence at the time and the location of the commission of the crime. An alibi does not attempt to justify or excuse a defendant's actions." *Giesberg*, 984 S.W.2d at 248. Defensive issues that merely negate an element of the offense alleged by the State "do[] not place a burden of proof upon a defendant to establish [them]." *Id.* at 250. A defense such as alibi "casts doubt upon whether the State has met its burden" and is therefore "sufficiently embraced in a general charge to the jury that the defendant is presumed innocent until he or she is proven guilty beyond a reasonable doubt." *Id.* Because a general charge adequately encompasses an alibi

defense, "a special instruction for the issue of alibi would needlessly draw a jury's attention to the evidence which raised alibi." *Id.* Thus, the Court of Criminal Appeals concluded, a specific instruction on an alibi defense "would constitute an unwarranted comment on the weight of the evidence by the trial court." *Id.*; *see also Walters*, 247 S.W.3d at 212 ("In such a case, the non-statutory instruction would constitute a prohibited comment on the weight of the evidence.").

Here, during the charge conference, defense counsel requested the submission of three substantively identical jury instructions relating to the defense of third-party culpability. One of the instructions was worded as follows:

> You have heard from the evidence that a person other than [the] defendant committed the offense for which the defendant is charged. The defendant is not required to prove the other person's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt; therefore, the defendant is entitled to an acquittal.
>
> If you have a reasonable doubt as to the defendant's guilt, evidence that another person committed the charged offense may by itself leave you with a reasonable doubt. If after considering all the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty.

The trial court denied all three instructions.

We conclude that the *Giesberg* rationale is applicable here. Appellant sought the submission of three instructions calling the jury's attention to the fact that evidence was presented that MCPD officers had other suspects in the Wildman

case and that appellant was not present at the time that Wildman died and did not commit the crime. Although appellant couches these requests as instructions on the issue of "third-party culpability," by requesting these instructions he is essentially raising the defense of alibi. This defensive theory is not a statutory defense, an affirmative defense, or a legal justification for the charged conduct. And this defensive theory does not attempt to justify or excuse appellant's conduct. Instead, this defense negates an essential element of the State's burden of proof, namely, that appellant was present at the time of Wildman's murder and committed the charged acts. This defense thus simply attacks the issue of identity and "casts doubt" upon whether the State has met its ultimate burden beyond a reasonable doubt. *See Giesberg*, 984 S.W.2d at 250.

We therefore conclude, on the basis of *Giesberg* and its progeny, that appellant's third-party culpability defense does not entitle him to a specific jury instruction, and that, indeed, giving such an instruction would unduly call the jury's attention to the specific evidence supporting the proposition that someone else murdered Wildman and would constitute an impermissible comment on the weight of the evidence. *See Giesberg*, 984 S.W.2d at 248–50; *see also Walters*, 247 S.W.3d at 212 (following *Giesberg* and holding that, "generally speaking," non-statutory jury instructions constitute impermissible comment on weight of

evidence). We hold that the trial court correctly denied appellant's requested jury instructions on the defense of third-party culpability.

We overrule appellant's sixth issue.

### Chain of Custody

In his eighth issue, appellant contends that the trial court erroneously admitted the condom found at the Barnum murder, and the subsequent DNA testing results derived from that condom, because the State failed to establish a proper chain of custody.

Texas Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901(a). This rule "does not require the State to *prove* anything." *Silva v. State*, 989 S.W.2d 64, 67–68 (Tex. App.—San Antonio 1998, pet. ref'd) (emphasis in original); *see also Garner v. State*, 939 S.W.2d 802, 805 (Tex. App.—Fort Worth 1997, pet. ref'd). Instead, "[i]t requires only a showing that satisfies the trial court that the matter in question is what the State claims; once that showing is made, the exhibit is admissible." *Garner*, 939 S.W.2d at 805. Evidence may be authenticated or identified by different methods, including testimony from a witness with knowledge that an item is what it is claimed to be. TEX. R. EVID. 901(b)(1); *Dossett v. State*, 216 S.W.3d 7, 17 (Tex.

App.—San Antonio 2006, pet. ref'd); *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

The State meets the authentication requirement for admissibility once it "has shown the beginning and the end of the chain of custody, particularly when the chain ends at a laboratory. Any gaps and minor theoretical breaches go to the weight rather than the admissibility of the evidence, absent a showing of tampering." *Martinez*, 186 S.W.3d at 62; *see also Druery v. State*, 225 S.W.3d 491, 503–04 (Tex. Crim. App. 2007) ("Absent evidence of tampering or other fraud, which has not been presented here, problems in the chain of custody do not affect the admissibility of the evidence. Instead, such problems affect the weight that the fact-finder should give the evidence, which may be brought out and argued by the parties."). The trial court has discretion to determine the sufficiency of the predicate of authentication, and, absent an abuse of that discretion, we will not reverse the trial court's judgment. *Foster v. State*, 101 S.W.3d 490, 498 (Tex. App.—Houston [1st Dist.] 2002, no pet.). The trial court does not abuse its discretion in admitting evidence where it reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified. *Druery*, 225 S.W.3d at 502; *Dossett*, 216 S.W.3d at 17.

Although Officer Cates died before appellant's trial, and, thus, could not provide testimony regarding the specific procedure he used for gathering the

bedsheet at Barnum's apartment, the precise location where he discovered the condom, or the condition of the condom when he discovered it, Officers Ruiz and Null both testified that they observed Cates gather the corners of the sheet and place it in a container. Officer Null testified that, later that day, Cates called him to the crime scene unit office and showed him a plastic bag containing a used condom. He identified the same plastic bag at trial, noting that it was brought to court in an envelope labeled with Barnum's name, the location of the offense, the case number, and Officer Cates's name and badge number.

Appellant makes no allegations of alteration, tampering, or fraud. In these circumstances, problems in the chain of custody do not affect the admissibility of the evidence, but rather they affect the weight the jury gives to the evidence. *See Druery*, 225 S.W.3d at 503–04. Factors such as the apparent age of the condom, its appearance when recovered, and whether any fluid was present in the condom upon recovery are relevant to the question of whether appellant murdered Barnum at or near the time they engaged in intercourse, which affects the similarity of the Barnum murder to the Wildman murder; but the fact that testimony regarding these factors is absent does not affect the admissibility of the condom itself. We conclude that the State presented sufficient evidence for the trial court to conclude that the matter in question—the condom recovered from Barnum's bed—is what

its proponent, the State, claims that it is. *See* TEX. R. EVID. 901(a); *Garner*, 939 S.W.2d 805.

We hold that the trial court could have reasonably believed that a reasonable jury could find that the condom has been authenticated and identified, and, therefore, the trial court did not abuse its discretion in admitting the condom and the DNA evidence obtained from that condom. *See Druery*, 225 S.W.3d at 502; *Dossett*, 216 S.W.3d at 17.

We overrule appellant's eighth issue.

### Juror Coercion

Finally, in his ninth issue, appellant contends that the trial court erroneously denied appellant's motion for mistrial made when a juror indicated that she was being "attacked" or coerced to change her opinion by other jurors during deliberations.

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Appellant cites no authority for the proposition that alleged "coercion" of one juror by her fellow jurors is a proper basis to grant a motion for mistrial.

During deliberations, the trial court received a note from a juror requesting substitution of one of the alternate jurors. In the note, the juror stated,

> I have listened to all of the testimony and have seen all of the evidence, and my mind, heart, body, and soul ALL agree with the

> decision I have made. The problem is my decision differs from many of my fellow jurors and I am beginning to feel attacked to change my opinion. I am having headaches, stomach aches, and lack of sleep since this trial has begun. I don't know how this process goes, but I don't think I want to try to be persuaded to change my decision.

After the trial court informed the jury that the law does not allow for substitution of jurors in this situation and that it should continue its deliberations, the jury subsequently announced that it had reached a verdict. The jury found appellant guilty, and, on defense counsel's request, the trial court polled the jury. All of the jurors, including the one who had written the note, informed the trial court that the verdict was his or her own. Appellant presented no evidence that the juror who had written the note "did not actually agree with the jury's verdict after the verdict was given." *See Franks v. State*, 90 S.W.3d 771, 800 (Tex. App.—Fort Worth 2002, no pet.) ("In fact, Sawyer expressed agreement with the guilty verdict directly after the verdict was read [in a jury poll].").

Disagreements between jurors and attempts to influence the opinions of fellow jurors are part and parcel of the deliberative process. In the absence of any evidence that the juror returned a verdict that was not actually her own, we hold that the trial court did not err in denying appellant's motion for mistrial.

We overrule appellant's ninth issue.

**Conclusion**

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Publish. TEX. R. APP. P. 47.2(b).