**REVERSE and REMAND; and Opinion Filed August 1, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00547-CR

### THE STATE OF TEXAS, Appellant
### V.
### DALE LEE GILLILAND, Appellee

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-82279-2014**

## MEMORANDUM OPINION
Before Justices Bridges, Myers, and Brown
Opinion by Justice Brown

The State of Texas appeals the trial court's order granting Dale Lee Gilliland's motion to dismiss the indictment against him for lack of a speedy trial. In a single issue, the State contends the trial court erred because the *Barker v. Wingo* factors weighed against dismissal. We agree. Accordingly, we reverse the trial court's order and remand for further proceedings.

### BACKGROUND

On July 20, 2011, Gilliland was arrested for aggravated sexual assault of a child. He appeared before a magistrate on July 22. The magistrate set his bond at $75,000, and Gilliland posted bond.

Over three years after his arrest, on September 30, 2014, Gilliland was indicted for continuous sexual abuse of a young child, rather than aggravated sexual assault of a child. *See* TEX. PENAL CODE ANN. § 21.02 (West Supp. 2016). The indictment alleged that the offense

occurred on or about June 1, 2009, through June 30, 2011. Gilliland was arrested again on the new charge in late 2014 and was again released on bond.

Between January and December 2015, the case was passed six times. It was eventually set for a jury trial on April 25, 2016. On April 8, 2016, about two weeks before the trial setting, Gilliland requested a speedy trial. In his motion for a speedy trial, he asserted that if the trial did not go forward on April 25, he would be prejudiced due to the extensive pre- and post-indictment delay. Three days later, Gilliland filed a motion to dismiss the case for want of a speedy trial.

At a hearing on the motion to dismiss, the court heard argument of counsel and testimony from two defense witnesses, Gilliland and his wife. At the conclusion of the hearing, the trial court indicated it was leaning toward granting the motion to dismiss and asked the parties for briefs on the issue. After the parties briefed the issues, the court granted Gilliland's motion to dismiss. The State timely filed a notice of appeal.

## APPLICABLE SPEEDY TRIAL LAW

The Sixth Amendment guarantees a defendant in a criminal prosecution the right to a speedy trial. *Hopper v. State*, No. PD-0703-16, 2017 WL 2457442, at *5 (Tex. Crim. App. June 7, 2017). In *Barker v. Wingo*, the United States Supreme Court established a balancing test to be used in analyzing a speedy-trial complaint, in which the conduct of both the prosecution and defendant are weighed. *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530–32 (1972)). Courts are to consider four factors: the length of delay, the reasons for delay, to what extent the defendant asserted his right to a speedy trial, and any prejudice suffered by the defendant. *Id.* Before a court engages in an analysis of each *Barker* factor, however, the accused must first make a showing that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay. *Gonzalez v. State*, 435 S.W.3d 801, 808 (Tex.

Crim. App. 2014). Presumptive prejudice simply marks the point at which courts deem the delay unreasonable enough to trigger further inquiry. *Id.*

If a defendant makes a threshold showing of presumptive prejudice, a court must proceed to consider and weigh the remaining *Barker* factors. *Id.* Courts first weigh the strength of each factor and then balance their relative weights. *Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008). No one factor is either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial. *Id.* The four factors are related and must be considered together along with any other relevant circumstances. *Id.* While the State has the burden of justifying the length of the delay, the defendant has the burden of proving the assertion of the right and showing prejudice. *Id.* at 280. The defendant's burden of proof varies inversely with the State's degree of culpability for the delay. *Id.* Thus, the greater the State's bad faith or negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id.* at 280–81.

In reviewing a trial court's ruling on a speedy-trial claim, we apply a bifurcated standard of review. *Id.* at 282. We apply an abuse of discretion standard for the factual components, and a de novo standard for the legal components. *Id.* Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but the balancing test as a whole is a purely legal question. *Id.* Under the abuse of discretion standard, appellate courts defer not only to a trial judge's resolution of disputed facts, but also to his right to draw reasonable inferences from those facts. *Id.* Deference to the trial court is especially appropriate when credibility is involved. *Kelly v. State*, 163 S.W.3d 722, 727 (Tex. Crim. App. 2005). In assessing the evidence at a speedy-trial hearing, all of the evidence must be viewed in the light most favorable to the ultimate ruling. *Cantu*, 253 S.W.3d at 282.

## *Barker* Analysis

With these principles in mind, we turn to consider the four *Barker* factors.

### 1. Length of Delay

The length of delay is measured from the time an accused is arrested or formally accused. *Gonzalez*, 435 S.W.3d at 809. The length of delay is a double inquiry: A court must consider whether the delay is sufficiently long to even trigger further analysis of all the *Barker* factors, and if it is, then the court must consider to what extent the delay stretches beyond the triggering length. *Hopper*, 2017 WL 2457442, at *5. When the length of delay stretches well beyond the bare minimum needed to trigger a full *Barker* analysis, the length of delay weighs against the State. *Gonzalez*, 435 S.W.3d at 809. The longer the delay, the more prejudice is compounded. *Id.* There is no set time that triggers a full speedy trial analysis. *State v. Thomas*, 453 S.W.3d 1, 4 (Tex. App.—Dallas 2014, no pet.). In general, delay approaching one year is sufficient. *Id.*

In this case, there was a total delay between Gilliland's arrest and trial setting of 57 months. The delay between his arrest and subsequent indictment was 38 months, and the delay between indictment and trial setting was 19 months. The State acknowledges that either the total time period or the pre-indictment delay alone is sufficient to trigger a full speedy trial analysis.

In the trial court, Gilliland focused on the pre-indictment delay; his counsel told the court, "I'm not necessarily complaining about [the post-indictment delay] here except as it adds to the overall time." Because Gilliland complained primarily about the pre-indictment delay, we will focus on that time period as well. The length of the delay between the arrest and indictment stretched well beyond the bare minimum needed to trigger judicial examination of the claim. This factor alone weighs heavily against the State. *See Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002) ("plain-vanilla DWI case" with delay of almost four years between arrest and plea hearing); *McGregor v. State*, 394 S.W.3d 90, 113 (Tex. App.—Houston [1st

Dist.] 2012, pet. ref'd) (capital murder case with delay of three years and ten months between arrest and hearing on motion to dismiss).

## 2. Reasons for the Delay

Again, in considering this factor, we focus on the delay between Gilliland's arrest and indictment. When asked by the trial judge about the reason for the delay, the prosecutor stated that the complaint was made to the Allen Police Department on July 19, 2011, the day before Gilliland's arrest. The Collin County District Attorney's Office received the case from the police department on February 4, 2014, and presented it to the grand jury seven months later on September 30, 2014. Appellant was indicted that day. The State provided no information to explain the delay in getting the case from the police.

In assessing the reasons for a delay, a court must accord different weights to different reasons, and it must ask whether the government or the criminal defendant is more to blame for the delay. *Hopper*, 2017 WL 2457442, at *5. When, as here, the State offers no reason for the delay, this factor weighs in favor of finding a violation of the speedy trial right. *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003); *see State v. Jones*, 168 S.W.3d 339, 348 (Tex. App.—Dallas 2005, pet. ref'd) (unexplained delay, even if by sheriff's office, is attributable to State for speedy trial purposes). However, this factor does not weigh heavily in favor of finding a violation of the right. *Dragoo*, 96 S.W.3d at 314. In the absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay. *Id.* Thus, the lack of reason for the delay weighs against the State, but not heavily.

## 3. Defendant's Assertion of the Right to a Speedy Trial

A defendant bears the responsibility to assert his right to a speedy trial. *Cantu*, 253 S.W.3d at 282. The defendant's assertion of the right or his failure to assert it is entitled to

strong evidentiary weight in determining whether the defendant is being deprived of the right. *Balderas v. State*, 517 S.W.3d 756, 771 (Tex. Crim. App. 2016). A defendant's lack of a timely demand for a speedy trial indicates strongly that he did not really want one. *Id.* Further, the point at which the defendant asserts his right is important because it may reflect the seriousness of the personal prejudice he is experiencing. *Cantu*, 253 S.W.3d at 284. Also, filing for a dismissal instead of a speedy trial will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one. *Id*. at 283.

Gilliland first asserted the right to a speedy trial over four-and-a-half years after his initial arrest and about 18 months after he was indicted.[1] He did so by filing a motion requesting a speedy trial on Friday April 8, 2016, about two weeks before April 25, 2016 trial setting. Nothing in the record indicates the case would not have gone to trial as scheduled. Then on Monday April 11, 2016, Gilliland filed a motion to dismiss for violation of his speedy trial rights.

At the hearing in the trial court, the State asserted that Gilliland's recent assertion of the right weighed heavily against him. The prosecutor also argued, "[T]hey didn't ask for it to be indicted, they didn't follow the State while the case is being investigated those months." In addition, the prosecutor told the judge that the State had demanded the case be set for trial.

Gilliland's attorney disputed the prosecutor's representation that the State demanded the trial setting. Counsel stated the current prosecutor had not been present when the case was set for trial and that the prosecutor was incorrect about who demanded the trial setting. Defense counsel also told the court that at some point after Gilliland's arrest and before his indictment, counsel called the prosecutor in the Crimes Against Children division and was told there was no

---

[1] Gilliland asserts in his brief that he did not learn of his September 2014 indictment until he was rearrested about three months later in December 2014. He does not provide a record reference for this assertion, and we have not found this information in the record.

case yet. Counsel asked to be notified when the district attorney's office did have a case "so we can present a Grand Jury packet." He heard nothing about the case for three years and was not given notice of the grand jury setting. Gilliland's counsel questioned where he would have asserted his demand for a speedy trial when no case had been filed. Similarly, in his appellate brief, Gilliland challenges the notion that he should have "fought harder to hurry up and get indicted." The trial judge agreed that the idea was "a little specious."

But there is case law from the court of criminal appeals supporting the idea that a defendant who has been arrested but not indicted bears some responsibility to bring his case to court. Gilliland's situation is similar to that of the defendant in *Cantu*. Cantu was arrested for driving while intoxicated and was released on bond the next day. Sixteen months later he was formally charged with the offense. *Cantu*, 253 S.W.3d at 277.

The court of criminal appeals stated that although a person cannot file a motion for speedy trial until formal charges are made, the right to one can be asserted in other ways. *Id.* at 284 (citing *Dillingham v. United States*, 423 U.S. 64, 65 (1975) ("invocation of the speedy trial provision . . . need not await indictment, information or other formal charge")). The court went on to state:

> An accused in appellant's place — arrested but not formally charged — has a choice: He can wait until he is charged, then file a motion for a speedy trial, and, if this request is not honored, he can file a motion to dismiss because he has diligently sought what he is entitled to — a speedy trial. Or he can wait until he is charged and simply file a motion to dismiss if he can show that he diligently tried to move the case into court before formal charges were filed.

*Id.* (footnotes omitted). In support of the above proposition, the court of criminal appeals cited *Sinclair v. State*, 894 S.W.2d 437 (Tex. App.—Austin 1995, no pet.). *Id.* at 284–85 n.54 & 55.

In *Sinclair*, the defendant was accused of embezzling from her employer and was arrested for theft. She was indicted three years and ten months after her arrest. The record supported a conclusion that the delay was due to prosecutorial negligence. *Sinclair*, 894 S.W.2d at 440. A

relatively short time after indictment, the defendant moved to dismiss for want of a speedy trial. The court of appeals determined that the defendant's failure to diligently assert her right to a speedy trial during the time period between arrest and indictment weighed heavily against her. *Id.* As in this case, the defendant asserted there was little she could have done to assert her right to a speedy trial prior to indictment. Prior to indictment, defense counsel had written a letter to the district attorney's office asking that his client be allowed to appear before the grand jury, and he spoke with prosecutors about the case on three occasions. The Austin court determined, however, that "an attorney whose client was truly interested in the prompt disposition of the accusations against her" would have done more. *Id.* The court upheld the trial court's decision to overrule the defendant's motion to dismiss. *Id.*

As set out in *Cantu*, Gilliland had two choices. After he was indicted, he could have first filed a motion for speedy trial and then moved to dismiss if his request was not honored. *Cantu*, 253 S.W.3d at 284. Or he could have proceeded straight to filing a motion to dismiss after indictment if he could show he diligently tried to move the case into court before indictment. *Id.* Gilliland did not properly assert either choice.

At the speedy trial hearing, defense counsel told the court that prior to indictment, he made one phone call to the district attorney's office to ask to be notified when the case was presented to the grand jury. In his brief to the trial court after the hearing, Gilliland asserted his attorney "made several more phone calls over the course of the years and always received the same answer — we don't have the case and we don't know anything about it." Also in his trial brief, Gilliland asserted his attorney contacted the police department several times to inquire about the status of the case and either did not receive a call back or was informed it was "not my case." The State contends counsel should have provided the additional information contained in the trial brief at the hearing when the State had the opportunity for rebuttal in open court. But

even if we consider that several phone calls were made to the district attorney and to police, these efforts are similar to those which were found to be insufficient in *Sinclair*. *See Sinclair*, 894 S.W.2d at 440. Further, Gilliland did not promptly move to dismiss after the indictment.

As for his other option, Gilliland did not promptly request a speedy trial. He moved for a speedy trial about 18 months after he was indicted. And he did so two weeks before trial. Further, he filed his motion for a speedy trial on a Friday and then on Monday asked for the case to be dismissed. Under these circumstances, Gilliland's motion requesting a speedy trial was merely perfunctory and does not reflect a true desire for a speedy trial. *See Cantu*, 253 S.W.3d at 283. Gilliland's failure to timely and diligently assert his right to a speedy trial weighs heavily against him.

## 4. Prejudice to the Defendant

The last *Barker* factor is prejudice to the defendant. *State v. Munoz*, 991 S.W.2d 818, 826 (Tex. Crim. App. 1999). The prejudice factor is assessed in light of the interests the right to a speedy trial is designed to protect. *Hopper*, 2017 WL 2457442, at *5; *Munoz*, 991 S.W.2d at 826. These interests are: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. *Hopper*, 2017 WL 2457442, at *5. Of these interests, the most serious is the last because the inability of the defendant to adequately prepare his case skews the fairness of the entire system. *Munoz*, 991 S.W.2d at 826. Affirmative proof of particularized prejudice is not essential to every speedy-trial claim because excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify, and its importance increases with the length of the delay. *Hopper,* 2017 WL 2457442, at *5. In such instances, the defendant is absolved from the requirement that he demonstrate prejudice. *Gonzalez*, 435 S.W.3d at 812.

At the hearing, Gilliland's wife Lesa testified that the complainant, P.W., lives in the Gillilands' neighborhood. P.W. and the Gillilands' daughter K.G. went to the same school and were playmates. K.G. was eleven when the allegations against her father arose, and P.W. was one year older than K.G. Other children in the neighborhood came to the Gillilands' home and played with both K.G. and P.W. In the time between Gilliland's arrest and indictment, three girls who frequented the Gilliland home moved out of the country. Lesa testified that those girls had knowledge of the relationship between P.W., K.G., and Gilliland. They were also present at the community swimming pool where the most serious of the allegations, involving oral sex, allegedly occurred. Defense counsel asked Lesa, "Are these children outside of both your jurisdiction to ask them to come, and outside of your financial means to ask them to come back to testify?" Lesa replied, "Absolutely." At the time the girls moved, Gilliland had not been formally charged with a crime and they had not begun to formulate a defense.

Lesa further testified that K.G. continued to attend school with P.W. for three years after the arrest. During those years, K.G. suffered ostracism, embarrassment, bullying, and "general girl meanness." Females at school told K.G. her father was a child molester and would soon be in prison. Lesa stated K.G. has suffered tremendously from social anxiety and alienation. Much of the bullying was instigated by P.W. K.G. did not have the intellectual and emotional capacity to deal with those things. Lesa noticed that her daughter was depressed and isolated. When K.G. was in ninth grade, before Gilliland was indicted, the situation reached a "breaking point." K.G. did not come out of her room for three days. She would not eat or talk to her family. The Gillilands decided to pull K.G. out of school and homeschool her. When asked if she believed K.G. would have had the social and intellectual means to combat the accusations against her at school if "you had been able to address the issues . . . within a year of the original arrest . . . and your husband had been exonerated," Lesa testified she thought K.G. could have combatted them.

In addition, Lesa testified the family had become isolated. The parents' participation in church and school activities changed after the allegation and the delay.

Gilliland testified that he was arrested at his house on July 20, 2011. He paid $7,500 to bond out of jail and was required to check in with the bail bondsman weekly. He was repeatedly told "we have no court date." Gilliland testified that after the indictment was filed, he was arrested again in November 2014, and spent one day in jail.[2]

Gilliland testified that he had been an insurance agent for State Farm for eighteen years. After he was indicted, State Farm ran a periodic background check on him and terminated his contract on December 3, 2015. Gilliland attempted to find other work in the insurance field, but was out of work until April 2016, because of the charges against him. The time he was unemployed caused financial strain on his household. They exhausted their savings to pay household expenses and medical bills. Gilliland also had to pay for legal representation.

Gilliland also spoke about the effect the case had on his daughter K.G. He saw K.G. becoming withdrawn and less interested in school. He testified it was heartbreaking and also that he felt defenseless watching his child endure something he could not protect her from. Further, after his arrest, Gilliland stopped going to things his kids were involved in, such as sporting events and school open houses. He did not want to risk crossing paths with the complainant and did not want to cause "blowback" for his other children. Gilliland stated his family had become reclusive. He felt considerable humiliation and shame, as well as stress and anxiety. He stated he had experienced people looking at him "crossways" in public. He was worried about what could happen to him and his family if he is convicted.

The State challenged aspects of Gilliland's evidence of prejudice. The State asked Lesa when the girls who were potential witnesses had moved. Lesa testified that two girls were sisters

---

[2] The sheriff's return on the capias for Gilliland's second arrest shows the date of arrest was December 18, 2014.

and moved to Sweden three or four years before the hearing. The third girl moved two or three years before the hearing. Lesa had not contacted them and did not know if they were willing to come back to the United States for trial or if they were willing to testify on her husband's behalf. The prosecutor raised the possibility of the girls testifying via computer. Lesa did not know if the girls had the capability to do so.

Also, the State asked Gilliland if the delay in indictment allowed him to keep his job longer. Gilliland acknowledged he would have been terminated before December 2015 if he had been indicted earlier. Gilliland testified he remembered his interactions with P.W. when she was in his home and also outside his home at the community pool. He gave a statement to an investigator after his arrest. He was not sure if the statement was recorded, but assuming it was, he could watch it to refresh his memory. Gilliland stated nothing in the conditions of his bond required him to stay away from school events; it was a personal choice he made. Gilliland had not attempted to contact the three girls who moved away. His daughter would have seen the same types of interaction between him and the complainant as those three girls. He expected that her testimony would be substantially similar to theirs.[3]

Of the three interests the right to speedy trial is designed to protect, the first, preventing oppressive pretrial incarceration, is not an issue in this case. Gilliland was released on bond and spent a minimal amount of time in jail.

The second interest is minimizing anxiety and concern of the accused. As the United States Supreme Court has stated, "Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety

---

[3] We note the clerk's record reflects the defense subpoenaed four other child witnesses, plus K.G., to testify on Gilliland's behalf at trial. These witnesses were not mentioned at the hearing, so we have no information about the knowledge these children possessed.

in him, his family, and friends." *United States v. Marion*, 404 U.S. 307, 320 (1971). Further, even if an accused is not incarcerated prior to trial, he is still disadvantaged . . . by living under a cloud of anxiety, suspicion, and often hostility." *Zamorano*, 84 S.W.3d at 654 (quoting *Barker*, 407 U.S. at 532.). General anxiety is at least some evidence of the type of anxiety that the Supreme Court considers under the prejudice prong of *Barker*. *Cantu*, 253 S.W.3d at 285–86. But evidence of generalized anxiety, though relevant, is not sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation. *Id.* at 286.

We disagree with the State's assertion that the anxiety shown in this case was merely "general anxiety" associated with a criminal charge. Viewing the evidence in the light most favorable to the trial court's ruling, Gilliland presented evidence from which the court could have determined that the delay between arrest and indictment caused him and his family more than mere general anxiety. Gilliland presented evidence the charges had an extreme negative effect on his daughter K.G. and, by extension, him. K.G. was bullied and ostracized at school as a result of the allegations against her father. She became isolated and depressed, and her parents eventually pulled her out of school to be homeschooled. This occurred prior to Gilliland's indictment.

We note that the evidence of anxiety caused by financial strain was rebutted. Gilliland lost his job with State Farm when it found out about the indictment. But he admitted the delay in indictment helped him keep that job longer, and he did find other employment in the insurance field four months later.

The third and most important interest is limiting the possibility that the defense will be impaired. Gilliland put on some evidence that the delay impaired his defense. Prior to his indictment, three girls who had knowledge of his relationship with P.W. and who had been in his

–13–

home and at the community pool with him and P.W. moved overseas. But the State rebutted this evidence by showing the Gillilands had not attempted to contact these potential witnesses and did not know if they would even be willing to testify for Gilliland. *See Ortega v. State*, 472 S.W.3d 779, 787–88 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (defendant who raised speedy-trial complaint failed to show she exercised due diligence in attempting to find missing witnesses and that their testimony would have been material to defense). Further, although Gilliland suggested the girls may have a reduced recollection of the events, a bare "assertion of dimming memories" does not constitute some showing of impairment to the defense. *See Munoz*, 991 S.W.2d at 829. In addition, Gilliland played some role in any potential reduced recollection by failing to promptly move for a speedy trial after indictment.

Having considered all three interests the right to speedy trial is designed to protect, we conclude Gilliland showed some evidence of prejudice, mostly related to the second interest, anxiety the delay between arrest and indictment caused him. Although he presented evidence of the most important interest, impairment of his defense, this evidence was not strong as he did not show that he made any attempt to contact the witnesses he asserted were unavailable. Further, there was no showing that the witnesses would have been willing to testify on his behalf or that their testimony would have been material to his defense. On the whole, the prejudice factor weighs in favor of Gilliland, but not heavily.

**Balancing Test**

The last step in our analysis is to balance the *Barker* factors. Of the four factors, three weigh against the State — the length of the delay between arrest and indictment, which weighs heavily against the State, the reason for the delay, which weighs slightly against the State, and the prejudice to the defendant, which weighs slightly against the State. The remaining factor, assertion of the right, weighs very heavily against Gilliland. He waited 18 months after he was

indicted to move for a speedy trial. In addition, he first asserted his desire for a speedy trial on a Friday about two weeks before case was supposed to go to trial, and nothing in the record indicates the case would not have gone to trial as scheduled. Then, after the weekend, Gilliland moved on Monday to dismiss for want of a speedy trial. These facts indicate Gilliland wanted a dismissal rather than a speedy trial. *See Balderas*, 517 S.W.3d at 771 (lack of timely demand for speed trial strongly indicates defendant did not really want one). We are mindful that we are required to defer to any implied findings by the trial court. *See Cantu*, 253 S.W.3d at 277, 282 (court of appeals, which reversed trial court's decision to deny motion to dismiss, did not properly defer to trial court's implied factual findings regarding *Barker* factors). In this case, however, the facts are largely undisputed. We do not like the unexplained delay of more than three years between Gilliland's arrest and indictment. But the delay was not so excessive as to give rise to a presumption of prejudice. *See Jones*, 168 S.W.3d at 352. While Gilliland put on evidence of prejudice, the evidence is slight. Gilliland's attempt to show that his defense was impaired due to the delay, the most serious interest the right to speedy trial protects, was effectively rebutted. Although three potential witnesses moved far away, Gilliland made no effort to contact them to determine their availability and did not even know if they were willing to testify on his behalf. *See Ortega*, 472 S.W.3d at 787–88. Gilliland provided evidence the delay caused him and his family, particularly his daughter, a great deal of anxiety. But the four *Barker* factors are related and must be considered together. The late date at which Gilliland asserted his right to a speedy trial may be a reflection of the degree of personal prejudice he experienced. *See Cantu*, 253 S.W.3d at 284. We must apply the balancing test with common sense and sensitivity to ensure that charges are dismissed only when evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. *Balderas*, 517 S.W.3d at 773. On balance, Gilliland cannot overcome the fact that his delay in asserting his

–15–

right to a speedy trial reflects a desire for a dismissal rather than for a speedy trial. This factor weighs so heavily against Gilliland that it outweighs the other three factors. We conclude the *Barker* factors weigh against finding a speedy-trial violation and that the trial court erred in granting Gilliland's motion to dismiss. We sustain the State's sole issue.

We reverse the trial court's order granting the motion to dismiss and remand the case to the trial court for further proceedings.

/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b).

160547F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-16-00547-CR  V.

DALE LEE GILLILAND, Appellee

On Appeal from the 416th Judicial District Court, Collin County, Texas
Trial Court Cause No. 416-82279-2014.
Opinion delivered by Justice Brown, Justices Bridges and Myers participating.

Based on the Court's opinion of this date, the trial court's order granting the motion to dismiss for violation of the right to a speedy trial is **REVERSED** and the cause **REMANDED** for further proceedings consistent with this opinion.

Judgment entered this 1st day of August, 2017.