**Opinion issued July 8, 2021**



**In The**

# Court of Appeals

**For The**

# First District of Texas

—————————————

**NO. 01-20-00282-CR**

—————————————

**JOHN JOE CAMACHO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 461st District Court**
**Brazoria County, Texas**
**Trial Court Case No. 86317-CR**

---

**MEMORANDUM OPINION**

A jury found John Joe Camacho guilty of the offense of aggravated assault with a deadly weapon[1] against Debbie (a pseudonym), his former girlfriend and the mother of his two children. The trial court assessed Camacho's punishment at 20

---

[1] *See* TEX. PENAL CODE §§ 22.01, 22.02(a)(2).

years in prison. In one issue, Camacho contends that the trial court abused its discretion when it admitted, during the guilt-innocence phase, evidence of extraneous acts of domestic violence committed by Camacho against Debbie.

We affirm.

## Background

In 2011, Camacho and Debbie met at a restaurant where they both worked. Camacho was 33 years old, and Debbie was 17. They began a romantic relationship, and, when she was 19, Debbie became pregnant with Camacho's child, a son. At trial, Debbie testified that they "never had problems" until she became pregnant. Camacho then became angry, accusing her of intentionally becoming pregnant and telling her that she had "ruined his life."

The couple separated during Debbie's pregnancy, and Camacho began a romantic relationship with another woman, Amelia. Camacho was present when Debbie gave birth to their son, and he and Debbie reconciled. However, Camacho also continued his relationship with Amelia. Debbie found out about the relationship, and she and Camacho argued about it. During the argument, Camacho hit Debbie in the eye with his cell phone. Debbie testified that Camacho had hit her hard enough that it broke his phone. Photographs admitted at trial showed the injuries to Debbie's face.

Camacho told Debbie that if she loved him, she "would allow him to have both [her and Amelia] because he didn't want to have to choose" between them. Debbie did not want to agree to that arrangement but decided to accept it. Debbie continued to accept the arrangement until she realized that she was pregnant with Camacho's second child, a daughter.

Amelia had been living with Debbie. When she realized that she was pregnant, Debbie asked Amelia to move out. Amelia moved out, but Camacho continued to see Amelia.

During Debbie's second pregnancy, Camacho denied that the second baby was his. Debbie testified that, on one occasion, a drunk Camacho poured beer over her head and hit her in the stomach and kicked her. Camacho told her that he "was going to take [the baby] out and hang her." Debbie said that she did not call the police regarding the incident.

Amelia was also present during this incident. Amelia testified that Debbie said something "smart" to Camacho, and he "flipped" and tried to hit Debbie. Amelia said that she defended Debbie because Debbie was pregnant. Amelia also recalled other instances when Debbie and Camacho argued. At these times, she said that Camacho would "lash out," and Debbie would hit back in defense. Amelia also recalled an instance when Camacho was drunk and "really violent." She saw him

3

slap Debbie, and then Debbie and Camacho were "going back and forth" with "more slaps and a few punches."

When asked when she had first talked to the police about Camacho, Debbie testified that Camacho would call the police and tell them that she had attacked him. She said that the police would contact her at work, and she would also go to the police station to "tell [her] side of the story." The police would not arrest her but would "keep it on file."

Another incident of domestic abuse occurred in 2015, during which Debbie reported to the police that Camacho had choked her. Officer Z. Guthrie of the Alvin Police Department, who responded to the incident, testified for the State. Officer Guthrie stated that, when he arrived at Debbie's apartment, he spoke to her and found her "distraught." He stated that Debbie had "markings" on her that indicated she had been involved in a "physical altercation." Officer Guthrie noted that Debbie had "bruising and swelling underneath both of her eyes" and a "hematoma on the front side of her forehead." She also had "red ligature marks around her throat and neck area and then some bruising on the inner side of her biceps." Officer Guthrie took photographs of Debbie's injuries, and the photographs were admitted into evidence. Officer Guthrie testified that he arrested Camacho and that Camacho was charged with "assault causing bodily injury family violence." But the charge was later

dismissed at Debbie's request and after Camacho completed anger-management classes.

Debbie also testified about yet another incident, which occurred in August 2017. Debbie had asked Camacho to watch the children at her apartment so that she could go job hunting. When he arrived, Camacho started an argument, a tactic Debbie said he used to avoid watching the kids. Debbie told Camacho that he needed to stay to watch the children. She said she and Camacho then began shoving one another. Debbie called the police. When they arrived, the police "couldn't tell who started it" because Debbie had no marks, and Camacho had scratches on his chest made by Debbie.

Officer Q. Santucci with the Alvin Police Department was dispatched in response to Debbie's call. He testified that he spoke to Debbie and Camacho. He said that Debbie and Camacho had been in a "tussle." He arrested Debbie and Camacho for Class C misdemeanor assault because both admitted to him that they had "put hands on each other in some form or fashion during the argument." Debbie testified that the charges against her were later dismissed.

After the 2017 incident, Debbie stated that Camacho "g[ot] better" and that they did not fight as much. She attributed the improvement to Camacho's sobriety, saying he "he stopped drinking and doing coke."

5

The offense involved in this case occurred on November 17, 2018. Debbie testified that she was working at a call center at that time and had asked Camacho to take care of their children while she worked. Because she needed to leave for work at 8:00 a.m., she asked Camacho to spend the night. Camacho did not arrive at Debbie's home until 1:00 a.m. Debbie testified that when he arrived, Camacho was "very dunk." Debbie asked Camacho to sleep on the couch, but he wanted to sleep with her. When she said he could not sleep with her, Camacho decided to sleep in their son's room. Debbie told him that he could not sleep there because he would wake up the child.

Camacho became angry and left Debbie's home. Debbie then began recording a video on her cell phone because she thought Camacho would return and confront her. When he returned, Camacho thought Debbie had called the police, which made him angrier. Debbie showed him her phone, so he could see that she had not called the police. Debbie testified that Camacho then yelled at her and pulled her hair. As Camacho pulled her down to the floor by her hair, Debbie grabbed a knife from the kitchen counter. When he saw that she had a knife, she said that Camacho placed her face down on the floor. Debbie's cell phone was recording, and Camacho told Debbie to admit that she tried to stab him. Camacho had Debbie in a headlock, and she could not breathe. She said that she faded in and out of consciousness and

6

urinated on herself. Camacho told her that if she did not fight back "it [would] be a lot quicker." Debbie testified that she thought, at the time, that she was about to die.

Camacho eventually released Debbie and told her to change her clothes. She went into the bedroom while Camacho looked through her phone. He yelled at Debbie about what he saw on her phone and came into the bedroom with the knife that she had grabbed earlier from the counter. Debbie was standing on the bed, and Camacho swiped at her with the knife, grazing her leg. Eventually, Debbie was able to run out the back door to a neighbor's house where she used their phone to call the police.

Officer J. Ashley responded to Debbie's call and testified at trial. Video from his body camera was also admitted. Officer Ashley testified that he met Debbie outside her home and observed that she "was barefoot, erratic, crying, pretty banged up." Officer Ashley said that Debbie had "visible bruising" on her face, shoulders, arms, and knees. He also noted that she had "marks from being hit or possibly strangled." Debbie told Officer Ashley that Camacho had hit her. And she told him that Camacho had a knife. Photographs of Debbie's injuries were admitted into evidence at trial. The photographs included a picture of a straight cut on Debbie's leg, which Officer Ashley indicated was consistent with the knife found at the scene, identified by Debbie as the knife involved in the altercation.

Officer Ashley also testified that Camacho told him at the scene that Debbie had pulled a knife on him when he had tried to leave. Camacho said that he had taken the knife away from Debbie and claimed that he had not hit her. He stated that Debbie had hit him, and he told Officer Ashley that he wanted to press charges against Debbie. Camacho also told Officer Ashley that he and Debbie had committed past domestic violence against each other.

Officer Ashley testified that Camacho was arrested and transported to jail. During the booking process, Officer Ashley noted Camacho had no injuries, other than what appeared to be defensive wounds to his chest, back, and arms. He indicated that Camacho's wounds appeared to be from Debbie scratching Camacho, "trying to get him off" of her.

The State also offered the testimony of David Moore, executive director of the Women's Center of Brazoria County, which provides domestic violence and sexual assault services to victims. Moore testified as an expert witness to explain the cycle of violence involved in domestic abuse, including the dynamics of power and control between the abuser and the victim. Moore explained the three phases of abuse comprising the cycle of domestic violence, including the phase when tension builds between the abuser and victim, the explosive phase when the abuse occurs, and the honeymoon phase when the abuser may convince the victim that the abuse will not happen again and that the abuser has changed.

Camacho testified in his own defense at trial. His version of the events that had occurred on November 17, 2018, was different than Debbie's version. He testified that he had tried to avoid a confrontation with Debbie that night by walking away and sleeping in their son's room, but she had followed him and continued to argue. Camacho claimed that the argument became physical when Debbie grabbed a knife. To defend himself, Camacho disarmed Debbie by taking the knife away. He said that he feared for his life. Camacho explained that he was attempting to deescalate the situation. Camacho indicated that he had restrained Debbie on the floor because she was combative but did not intend to impede her breathing. He believed that she was able to breathe because she was yelling and talking to him. Camacho stated that he did not hit Debbie during the altercation. He indicated that prior to that night, he had been working on deescalating their fights and stated that he had not hit Debbie since 2015.

During his case-in-chief, Camacho also questioned Debbie about a letter that she had written and sent to the district attorney's office and to the trial court about the case.[2] She acknowledged that, in the letter, she had taken responsibly for the altercation. Debbie agreed that, in the letter, she had stated that she had pulled a knife on Camacho and that the altercation began because she had grabbed the knife. She

---

[2] The defense attempted to introduce the letter into evidence, but the letter was not admitted into evidence after the trial court sustained the State's hearsay objection to it. However, Debbie testified about the letter's content.

9

also acknowledged that she said in the letter that there were "plenty of times" that she had attacked Camacho in the past, including slapping him "out of jealousy and anger."

In addition, Debbie had testified earlier in the trial that she was not testifying voluntarily. She stated that she had told the district attorney's office that she did not want to testify. She said that the district attorney's office informed her that she was required to testify because she had been subpoenaed. Debbie's understanding was that if she did not testify, a warrant would be issued for her arrest. When asked whether she wanted Camacho to go to prison, she said she had "mixed" feelings about it.

A two-count indictment charged Camacho with the offense of family-violence assault by impeding breathing or circulation and the offense of aggravated assault with a deadly weapon, namely, a knife. The jury found Camacho guilty of the offense of aggravated assault with a deadly weapon but found him not guilty of the offense of family-violence assault impeding breathing or circulation.

Camacho elected to have the trial court assess his punishment. After preparation of a pre-sentence investigation report and a punishment hearing, which included additional witness testimony, the trial court assessed Camacho's punishment at 20 years in prison. Camacho now appeals.

**Evidence of Extraneous Acts of Domestic Violence**

In his sole issue, Camacho contends that the trial court abused its discretion when it admitted evidence of his extraneous acts of domestic violence against Debbie.

## A.      The Trial Court's Ruling

Before voir dire began, the trial court addressed Camacho's motion in limine in which he objected to the admission of evidence of extraneous acts of physical abuse he had committed against Debbie. In response, the State pointed to Code of Criminal Procedure article 38.371, which permits (with limitations discussed below) the admission of evidence in family-violence cases "of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense[,] . . . including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim." TEX. CODE CRIM. PROC. art. 38.371(b). The trial court agreed with the State, ruling that it would allow the evidence but instructed the parties to approach the bench before offering evidence of past physical abuse.

After voir dire, the State approached the bench pursuant to the in limine ruling, seeking to introduce evidence of past acts of physical abuse committed by Camacho against Debbie. The State specifically mentioned (1) the 2015 incident to which Officer Guthrie had responded, (2) the incident witnessed by Amelia while Debbie

was pregnant, and (3) the 2017 incident for which both Debbie and Camacho were arrested.

The State again asserted that the past acts of physical abuse were admissible under Code of Criminal Procedure article 38.371. The State informed the trial court that it planned to offer the testimony of domestic-abuse expert David Moore, which would aid the jury in understanding the mentality of domestic-abuse victims and, more particularly, would aid the jury in understanding why Debbie "[would] be reticent to testify against Camacho." The State asserted that that when, as here, past domestic abuse is not prosecuted or stopped, the victim may feel that the abuser is "impervious to prosecution, that he is immune from any consequences of his actions" and that the abuser "can beat her up in front of someone else that [sic] is not going to do anything about it."

The prosecutor further told the trial court:

[W]hen Debbie does come and testify, I expect that she is not going to be a friendly witness for the State. She's going to be antagonistic. But again, given all of the history, knowing that essentially he has—all of the events have happened before and knowing that she is doubtful that anything will happen in this case, that is going to explain—or that serves to explain how she's going to be towards the State and how she's going to relay the events that day. And whether or not she recants or whether or not she adjusts any of her testimony while she's sitting here in front of him is going to be based on what she went through with him before, which is the entire purpose of [Code of Criminal Procedure article 38.371] that says it's important for the jury to understand the entirety of the relationship, the nature of that whole relationship, and kind of what happens in order for them to understand or receive the testimony with the correct context.

12

Camacho asserted that evidence showing his extraneous acts of domestic violence against Debbie was not proper article 38.371 evidence, and he objected to the evidence based on Rules of Evidence 404(b) and 403. *See id.*; TEX. R. EVID. 403 (providing that relevant evidence may be excluded when its probative value is substantially outweighed by danger of unfair prejudice); 404(b) (excluding evidence offered for purpose of proving conformity with bad character traits). The trial court overruled Camacho's objections, determining that evidence of Camacho's past acts of domestic violence against Debbie were admissible under article 38.371 because it was relevant to the nature of Debbie and Camacho's relationship.

Throughout trial—when the State offered evidence of Camacho's extraneous acts of physical abuse against Debbie—the trial court instructed the jury that it could not use "any extraneous offense evidence" to infer Camacho's guilt. The trial court told the jury that it could consider extraneous-offense evidence only regarding "the nature of the relationship" between Camacho and Debbie. The jury charge contained a similar limiting instruction.

## B. Standard of Review

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *see De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (explaining trial court's ruling on admissibility of extraneous offenses is reviewed under abuse-of-

13

discretion standard). We will not reverse the trial court's ruling unless it falls outside the zone of reasonable disagreement. *Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016); *De La Paz*, 279 S.W.3d. at 343–44. If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial court gave the wrong reason for its correct ruling. *De La Paz*, 279 S.W.3d at 343.

## C. Trial Court Acted Within its Discretion in Admitting Evidence of Extraneous Acts of Domestic Violence

### 1. Article 38.371 and Rule 404(b)

Article 38.371 permits the admission of evidence of "all relevant facts and circumstances" that may assist a trier of fact in certain family-violence prosecutions,[3] including the admission of evidence "regarding the nature of the relationship between the actor and the alleged victim." TEX. CODE CRIM. PROC. art. 38.371(b). But the statute precludes the admission of "character evidence that would otherwise be inadmissible" under the rules of evidence. *Id.* art. 38.371(c). Camacho complains that the trial court should not have admitted evidence of his extraneous

---

[3] Article 38.371 "applies to a proceeding in the prosecution of a defendant for an offense, or for an attempt or conspiracy to commit an offense, for which the alleged victim is a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code." TEX. CODE CRIM. PROC. art. 38.371(a). Family Code section 71.003, defines "family" to include "individuals who are the parents of the same child, without regard to marriage." *See* TEX. FAM. CODE § 71.003. Thus, there is no dispute that the charged offense in this case involved the prosecution of an offense to which article 38.371 could apply.

acts of physical abuse under article 38.371 because the evidence was improper character-conformity evidence proscribed by Rule of Evidence 404(b).

Rule 404(b) prohibits admission of extraneous-offense evidence during the guilt-innocence stage of trial to prove that a defendant committed a charged offense in conformity with a bad character. TEX. R. EVID. 404(b)(1); *see Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). However, extraneous-offense evidence may be admissible when it has relevance apart from character conformity. TEX. R. EVID. 404(b)(2); *Devoe*, 354 S.W.3d at 469.

The rule provides that extraneous-offense evidence may "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). The Court of Criminal Appeals has made clear that the exceptions listed in Rule 404(b) are neither mutually exclusive nor collectively exhaustive. *De La Paz*, 279 S.W.3d at 343.

Returning to article 38.371, "[a]reas of relevant and admissible extraneous-offense evidence that complies with article 38.371," and that serve non-character-conformity purposes in compliance with Rule 404(b), "include evidence that: (1) explains why a victim of domestic violence is unwilling to cooperate with prosecution; (2) confirms the victim's initial—and later recanted—statements to police; or (3) contextualizes the nature of the relationship between victim and

15

assailant." *Fernandez v. State*, 597 S.W.3d 546, 565 (Tex. App.—El Paso 2020, pet. ref'd) (citing *Gonzalez v. State*, 541 S.W.3d 306, 312 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Williams v. State*, No. 02-18-00382-CR, 2019 WL 2223214, at *3 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication)).

Here, the need for the extraneous physical abuse evidence, as explained by the State to the trial court after voir dire, was demonstrated by Debbie's testimony when she was questioned by the defense about the letter that she had written to the district attorney's office and to the trial court regarding this case. Debbie acknowledged that she had stated in the letter that she, not Camacho, had initiated the altercation by attacking Camacho with the knife. By her testimony, Debbie admitted that, in the letter, she had effectively recanted her initial allegations that Camacho had been the aggressor. But, by the time of trial, Debbie had again changed her position and testified for the State that Camacho was the aggressor and had attacked her.

Debbie also testified that she had told the State that she did not want to testify at trial. She said that the State informed her that she was required to testify because she had been subpoenaed. Debbie indicated that the only reason that she was testifying at trial was because she believed that she would be arrested if she did not testify.

16

The extraneous-offense evidence, particularly when viewed along with the testimony of domestic-abuse expert Moore, was relevant to assist the jury in understanding why Debbie, a victim of repeated domestic abuse, changed her story about what had occurred with respect to the charged offense. *See id.*; *Gonzalez*, 541 S.W.3d at 312 (reasoning extraneous-offense evidence admissible, inter alia, to explain victim's recantation). The evidence also explained why Debbie had an aversion to assisting the State, even though she testified that she thought she was about to die during the commission of the charged offense. *See Fernandez*, 597 S.W.3d at 565; *Williams*, 2019 WL 2223214, at *3 (noting that, because domestic-abuse victim testified that she would not have been witness against defendant had prosecution not subpoenaed her, trial court could have reasonably concluded that evidence of defendant's past assaultive behavior toward victim was necessary for jury to understand why she did not want to testify at trial and why the prosecutor had to subpoena her to do so).

In addition, the extraneous acts of domestic violence contextualized the nature of the relationship between Debbie and Camacho. *See Fernandez*, 597 S.W.3d at 565. Each act of past violence provided the jury with an example of Camacho's controlling and aggressive behavior that had influenced the dynamics of their relationship over the years and provided insight into the path that led to the violence of the charged offense. *See id.*; *Brickley v. State*, No. 03-19-00784-CR, 2021 WL

17

1418978, at *8 (Tex. App.—Austin Apr. 15, 2021, no pet. h.) (holding evidence of past incident of abuse admissible under article 38.371 "because it contextualized the nature of the relationship between [defendant] and [victim] and helped explain some of [victim's] conduct during the incident and her hesitancy in reporting the offense"); *Franco v. State*, No. 08-18-00040-CR, 2020 WL 3168560, at *8 (Tex. App.—El Paso June 15, 2020, no pet.) (mem. op., not designated for publication) (concluding that extraneous acts of domestic violence was non-character-conformity evidence admissible under article 38.371 to show behavior that defined victim and defendant's relationship); *see also Miller v. State*, No. 06-20-00015-CR, 2020 WL 4044717, at *2 (Tex. App.—Texarkana July 20, 2020, no pet.) (mem. op., not designated for publication) ("Since evidence of prior assaults against the same victim bears on the nature of the relationship between the defendant and the victim, it is relevant evidence."); *Williams*, 2019 WL 2223214, at *3 ("The trial court could . . . have concluded that [victim's] testimony regarding [defendant's] past assaultive conduct toward her was necessary for the jury to understand the relationship between [victim] and [defendant]."). And, as recognized by the El Paso Court of Appeals, the Texas Legislature has determined that, under article 38.371, the nature of the relationship itself is a permissible, non-character-conformity purpose for which evidence is

admissible.[4] *See Fernandez*, 597 S.W.3d at 565; *see also Mourning v. State*, No. 02-19-00168-CR, 2020 WL 6165309, at \*5 (Tex. App.—Fort Worth Oct. 22, 2020, no pet.) (mem. op., not designated for publication) ("Article 38.371(b) provides another . . . exception [to Rule 404(b)] by expressly allowing evidence 'regarding the nature of the relationship between the actor and the alleged victim.'").

In sum, the record shows that the evidence was relevant for non-character-conformity purposes, including to show the nature of the relationship between Debbie and Camacho. *See* TEX. CODE CRIM. PROC. art. 38.371(b); *Fernandez*, 597 S.W.3d 565. Based on the record, the trial court could have properly exercised its discretion by determining that the extraneous-offense evidence was admissible under article 38.371 and that the evidence did not violate Rule 404(b)'s prohibition

---

[4]     In his brief, Camacho claims that, in *Foster v. State*, this Court "acknowledged that extraneous-offense evidence otherwise inadmissible under Rule 404(b) does not *become* admissible simply by the expediency of being 'nature of the relationship' evidence under article 38.371." No. 01-17-00537-CR, 2018 WL 1914871, at \*3 (Tex. App.—Houston [1st Dist.] April 24, 2018, pet. ref'd) (mem. op., not designated for publication). Camacho's reading, however, obfuscates *Foster's* holding. In describing the content of the statute, we stated that article 38.371 "provides that the nature of the relationship between Foster and [the complainant] is admissible evidence so long as it is not character evidence that is otherwise prohibited by the Texas Rules of Evidence." *Id.* at \*4. We recognized that "Texas Rule of Evidence 404(b) excludes evidence offered for the purpose of proving conformity with bad character traits" and noted that there are exceptions to the rule. *Id.* We determined that the evidence of extraneous physical abuse by Foster was admissible to rebut Foster's theory that the complainant bruised easily and had consented to the abuse. *Id.* We concluded that "extraneous-offense evidence tended to show Foster's intent and lack of mistake in injuring the complainant." *Id.* Thus, in *Foster*, the evidence fell within the exceptions to Rule 404(b). *See id.*

against admitting evidence to demonstrate character conformity. *See* TEX. CODE CRIM. PROC. art. 38.371(b)–(c); TEX. R. EVID. 404(b)(1); *Fernandez*, 597 S.W.3d at 565. We hold that the trial court did not abuse its discretion in admitting the extraneous-offense evidence under article 38.371.

## 2. Rule 403

Camacho also objected that the admission of the extraneous acts of domestic violence violated Rule of Evidence 403, which provides that otherwise relevant evidence may be inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. The rule "favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). A Rule 403 analysis must balance (1) the inherent probative force of the proffered item of evidence, along with (2) the proponent's need for that evidence, against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

In determining the probative value of past criminal behavior, courts consider "the closeness in time between the extraneous offense and the charged offense," as well as "the similarities between the extraneous offense and the charged offense," "the State's need for the evidence," and whether there is an alternate source for the evidence. *Kiser v. State*, 893 S.W.2d 277, 281 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd). Here, the proof that Camacho had similarly physically abused Debbie on other occasions leading up to the charged offense was necessary for the jury to understand the dynamics and nature of their dysfunctional relationship. It was also needed to assist the jury in understanding why Debbie would write a letter to the district attorney and to the trial court taking responsibility for the altercation and why she was hesitant to testify at trial. And there was no alternate source for the evidence.

Camacho asserts that, for the jury to understand his volatile relationship with Debbie, it was necessary for the jury to hear only the evidence about the 2017 altercation for which they were both arrested. He claims that the other evidence about the extraneous acts of abuse were "cumulative and unnecessary." But, without showing that the abuse spanned over several years and that Debbie was physically injured by Camacho on other occasions, the jury would not have had a complete picture of the cycle of abuse or their relationship.

Camacho also asserts that it was unnecessary to admit photos of Debbie's injuries associated with the extraneous physical abuse. However, the photographs were an important aid to the jury in understanding the scope and extent of the abuse. And the photographs corroborated Debbie's testimony, which assisted the jury in assessing her credibility. *See Moreno v. State*, 409 S.W.3d 723, 730 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("[P]hotographic evidence corroborating the complainant's testimony was highly probative and necessary to the State's case."). Thus, the trial court could have reasonably determined that the probative value and need for the evidence was high.

Regarding whether presentation of the extraneous-offense evidence consumed an inordinate amount of time, we note that five witnesses—Amelia, Debbie, Camacho, and Officers Guthrie and Santucci—testified about the extraneous acts of domestic violence. Domestic-violence expert Moore also provided testimony relevant to the issue. Because there were multiple hearings regarding the admissibility of evidence throughout the witnesses' testimony, and some of the witnesses testified about other topics, including the charged offense, it is difficult to gage the exact amount of time or the percentage of the trial that was dedicated to evidence about the extraneous offenses. But, given the number of witnesses who testified about the topic, the portion of the record pertaining to the extraneous offenses is not insignificant. Accordingly, this factor weighed against admitting the

22

extraneous-offense evidence. *See McGregor v. State*, 394 S.W.3d 90, 121–22 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (concluding that fact that evidence of extraneous offenses constituted one-third of trial weighed against admissibility).

Although extraneous-offense evidence carries an inherent danger that a jury will convict for character conformity, here, the trial court gave a limiting instruction to the jury—verbally throughout trial and in writing in the charge—that minimized the risk that the jury would consider the extraneous-offense evidence for an improper purpose or give it undue weight. Because of the limiting instruction, which was repeated throughout trial, the trial court could have reasonably determined that the jury was unlikely to give the extraneous-offense evidence undue weight or to decide Camacho's guilt on an improper basis. *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (noting that limiting instructions can minimize impermissible inferences of character conformity); *Harris v. State*, 572 S.W.3d 325, 334 (Tex. App.—Austin 2019, no pet.) ("The district court's limiting instruction in the charge about [witness's] testimony minimized any risk that the jury would consider the substance of her questioning for any improper purpose or give it undue weight."). Finally, the extraneous-offense evidence was not confusing or technical in nature and would not tend to mislead the jury, which weighs in favor of admission of the evidence. *Cf. Gigliobianco*, 210 S.W.3d at 641 (noting that scientific evidence is of

23

type that "might mislead a jury that is not properly equipped to judge the probative force of the evidence").

When we consider all the factors together, the factor regarding the time spent developing the extraneous-offense evidence is the only factor weighing against admissibility. Given the standard of review, the presumption in favor of admissibility, and the resolution of the factors discussed above, we hold that the trial court did not abuse its discretion when it did not exclude, pursuant to Rule 403, evidence of the extraneous acts of domestic violence. *See Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) ("[Rule 403] envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value."); *McGregor*, 394 S.W.3d at 22 (holding that trial court did not abuse its discretion by admitting extraneous-offense evidence when only factor weighing against admissibility was time-spent factor).

## Conclusion

For all the above reasons, we overrule Camacho's sole issue challenging the admission of the evidence of extraneous acts of domestic violence committed by him against Debbie. We affirm the trial court's judgment of conviction.


Richard Hightower
Justice

Panel consists of Justices Kelly, Landau, and Hightower.

Do not publish. Tex. R. App. P. 47.2(b).